**UNITED STATES of America, Plaintiff,**

v.

**William Joseph HARVEY, et al., Defendants.**

**No. 82–73–Cr–SMA.**

United States District Court,
S.D. Florida,
Miami Division.

Aug. 30, 1982.

On Motion to Vacate Restraining Order
Feb. 14, 1983.

Stanley Marcus, U.S. Atty., S.D. Fla., by Neil Karadbil, Asst. U.S. Atty., Miami, Fla., for plaintiff.

James Jay Hogan, Joseph Beeler, Miami, Fla., for defendants.

INDEX

I. CONSTITUTIONALITY OF 18 U.S.C. §§ 2516, 2518 ------------pg. 1047

II. ALLEGED INVALIDITY OF ORDER UPON BASIS THAT AUTHORIZATION TO APPLY THEREFOR WAS NOT PERSONALLY DELEGATED --------------------------------------pg. 1048

III. AUTHORIZATION OF F.B.I. AGENTS TO INVESTIGATE DRUG–RELATED OFFENSES ----------------------------pg. 1049

IV. MARIJUANA–RELATED DRUG OFFENSES MAY BE PREDICATE RACKETEERING ACTS UNDER RICO ----------------pg. 1050

V. PROBABLE CAUSE FOR THE OCTOBER 20, 1980 ORDER ------pg. 1050

 1. Sufficiency of probable cause in the Affidavit itself. ----------pg. 1050

 2. Scope of RICO. ----------------------------------------pg. 1053

 3. Continuation of future conversations about past bribes, homicides, etc. -------------------------------------------------pg. 1053

 4. Staleness of the probable cause. -------------------------pg. 1054

 5. Necessity showing for the order was inadequate (use of alternative investigative techniques. --------------------------pg. 1055

VI. SEALING REQUIREMENTS -----------------------------pg. 1057

VII. THE ORDER OF NOVEMBER 20, 1980 WAS ALLEGEDLY INVALID -------------------------------------------------pg. 1058

 1. Carry-Over Objections. --------------------------------pg. 1058

 2. Insufficient probable cause for an extension. ----------------pg. 1058

 3. Was the district judge without authority to execute an extension order outside his territorial jurisdiction but operative within his territorial jurisdiction? --------------------------------pg. 1058

VIII. THE ORDER OF DECEMBER 19, 1980 WAS ALLEGEDLY IN-
VALID -------------------------------------------------------pg. 1058

 1. Carry-Over Objections. ------------------------------------pg. 1058

 2. Prior failure to name Defendant Kay as a target. ------------pg. 1058

IX. ALLEGED § 2517(5) VIOLATION (DISCLOSURE OF TITLE III
INTERCEPT AS TO A § 848 OFFENSE) ----------------------pg. 1060

 1. Section 848 was not an offense "other than those specified in the
order of authorization or approval" under § 2517(5). ----------pg. 1063

 2. The requirement of § 2517(5) was met. ---------------------pg. 1066

X. THE EFFECT OF MISSING PAGE 21C ----------------------pg. 1067

 1. Alleged violations of Title III. ----------------------------pg. 1070

 2. The allegation of intentional omission and the effect of missing
page 21C on the showing of probable cause. ----------------pg. 1073

XI. MINIMIZATION ---------------------------------------------pg. 1075

XII. FLORIDA STATE CHAPTER 934 INTERCEPT ---------------pg. 1076

 1. Probable Cause. -----------------------------------------pg. 1077

 2. Lack of Necessity. ---------------------------------------pg. 1078

 3. Improper Authorization. ---------------------------------pg. 1078

 4. First and Second Extension Orders unlawful. ---------------pg. 1078

 5. No authorization in Florida Statutes to wiretap for marijuana
offenses. --------------------------------------------------pg. 1079

 6. Whether § 2517(5) was violated regarding the state wiretap. ----pg. 1079

---

**ORDER DENYING MOTIONS TO SUPPRESS TITLE III ELECTRONIC SURVEILLANCE AND EVIDENCE DERIVED THEREFROM AND INCLUDING DENIAL OF MOTION TO SUPPRESS STATE TITLE III WIRE INTERCEPT AND EVIDENCE DERIVED THEREFROM**

ARONOVITZ, District Judge.

Defendants WILLIAM JOSEPH HARVEY, THOMAS SIKES and DENNIS KAY[1] addressed Motions to Suppress electronic surveillance and any evidence derived therefrom to a Title III oral intercept of communications of William Joseph Harvey, John Dennis Cason, Robert Jernigan, Bruce Emory Griffin, Wesley Simkins, Mike McCrary, Skip Hope, Arthur Michael Sakell, Joseph William Campbell, Jr., Gary Balough and Parker Peak, at the office of William Joseph Harvey, Defendant, located at 1945 South Dixie Highway, Delray Beach, Florida, a towing business conducted by Delray Towing Service, Inc., of which Harvey was alleged to be president.

The Honorable Eugene P. Spellman, U.S. District Judge, Southern District of Florida,

---

1. The following Defendants have also filed Motions to Suppress the federal Title III electronic surveillance and/or the Florida state Chapter 934 wiretap: Robert Gainer Jernigan, Joseph William Campbell, Jr., Gary Balough, John Dennis Cason, Gene Johnson, Marion Van Horn, Robert Van Horn, John Bertelsen, Scott Bertelsen and Jay Jernigan. Several Defendants have also filed Motions to Join and/or Adopt the Motions to Suppress filed by other Defendants. The Motions to Join and/or Adopt are hereby GRANTED, but only insofar as the Defendants seeking to Join and/or Adopt are "aggrieved persons" as defined in the Act. *See* 18 U.S.C. §§ 2510(11), 2518(10)(a).

entered the original order authorizing interception on October 20, 1980, for thirty (30) days (Defendant's Exhibit No. 4); an amended order on October 22, 1980 (Defendant's Exhibit No. 5); an order authorizing continued interception of oral communications for an additional thirty (30) days on November 20, 1980 (Defendant's Exhibit No. 16); and an order continuing interception for an additional thirty (30) days signed on December 19, 1980 (Defendant's Exhibit No. 26). The oral intercept commenced functioning on October 24, 1980, and remained in position and functioning until January 19, 1981.

A multitudinous attack has been made upon this Title III intercept. After reviewing extensively the original motions, all supplements thereto then pending, and the Government's omnibus response, this Court heard testimony and received evidence basically addressed to three (3) evidentiary issues, to-wit:

(1) The adequacy and sufficiency of minimization procedures and implementation;

(2) The effect of missing page 21C of the original affidavit of Harold Copus, Special Agent, F.B.I., not found among the unsealed original documents in this Title III intercept, as it related to the sufficiency of the affidavit itself to establish probable cause and as it related on a *Delaware v. Franks* [438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667], *infra*, basis and all issues arising from the omission of Page 21C from the original affidavit; and

(3) The adequacy of disclosure pursuant to 21 U.S.C. § 2517(3) and (5) in terms of a prior Florida state Title III wiretap and the federal Title III wiretap *sub judice*. Evidence was received with respect to the State Title III disclosure issue.

All other matters raised by the Defendants in these Motions to Suppress were legal issues and were heard extensively in oral arguments. The evidentiary hearings were conducted over a period of four days and oral argument thereon lasted one full day. Thereupon, having now considered the original Motion of William Joseph Harvey, five (5) Supplements thereto, the Motions of Thomas Sikes and Dennis Kay and all Supplements thereto, and considering the joinder therein of all co-defendants who are "aggrieved" persons, the Government's omnibus response, the testimony and evidence adduced and oral arguments, and being otherwise fully advised in the premises, it is thereupon

ORDERED AND ADJUDGED that each and every Motion to Suppress the Title III oral intercept and the evidence derived therefrom, and including Motions to Suppress the Florida Chapter 934 wire intercept and evidence derived therefrom, addressed by each and every Defendant entitled to do so by law is hereby DENIED, each respectively, for the reasons hereinafter set forth.

Findings of Fact and Conclusions of Law are made herein when applicable and required for those matters as to which testimony and evidence were received at an evidentiary hearing.

## I. CONSTITUTIONALITY OF 18 U.S.C. §§ 2516, 2518

In its memorandum in support of the Motion to Suppress (p. 23) Defendant Harvey "candidly concedes that most federal and state courts faced with the issue have found Title III (18 U.S.C. § 2510, *et seq.*) constitutional on its face.... For the purpose of appeal, this issue is once again here raised...." In *United States v. Sklaroff,* 506 F.2d 837 (5th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 142, 46 L.Ed.2d 105 (1975), the Fifth Circuit joined in the holdings of other circuits that Title III meets the constitutional tests for electronic surveillance set forth by the U.S. Supreme Court in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) and *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1966). *See also*

*United States v. Tortorello,* 480 F.2d 764 (2nd Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); *United States v. Cafero,* 473 F.2d 489 (3rd Cir. 1973), *cert. denied,* 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223 (1974). The statute in question is constitutional.

## II. ALLEGED INVALIDITY OF ORDER UPON BASIS THAT AUTHORIZATION TO APPLY THEREFOR WAS NOT PERSONALLY DELEGATED

█ 18 U.S.C. § 2516 provides that the Attorney General or any Assistant Attorney General specifically designated by the Attorney General may authorize an application for a wiretap. Here, authorization was given by Assistant Attorney General Philip B. Heymann (in charge of the Criminal Division) pursuant to Order No. 799–78 entered by Attorney General Griffin Bell on August 15, 1978 (Defendant's Exhibit No. 21). In August, 1979, Attorney General Benjamin Civiletti succeeded the Honorable Griffin Bell as Attorney General, although no new Order was issued prior to the wiretap authorization nor was the August 15, 1978 Order revoked. Two courts have specifically addressed the contention of Defendants which attempts to narrowly construe wiretap authorization from being exercised by any individuals other than the Attorney General or Assistant Attorney General and the issue of whether a general order of delegation survives the resignation of Attorney General Griffin Bell. *United States v. Wyder,* 674 F.2d 224, 226–27 (4th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982) and *United States v. Mallory,* 507 F.Supp. 99 (D.Md. 1981), both hold that the general rule that acts of administrative officials continue in effect after the end of their tenure until revoked or altered by their successors in office applies in the circumstances *sub judice.* The correspondence of October 16, 1980, from Philip B. Heymann, the Assistant Attorney General in charge of the Criminal Division, to Philip Wilens, Director

of the Office of Enforcement Operations, clearly demonstrates that the surveillance was properly authorized within the meaning of *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). The specific designation was lawful because it delegated authority to the Assistant Attorney General of the Criminal Division, not a specific named individual. *United States v. Wyder, supra,* and *United States v. Mallory, supra; United States v. Todisco,* 667 F.2d 255 (2nd Cir.1981), *cert. denied,* 455 U.S. 906, 102 S.Ct. 1250, 71 L.Ed.2d 444 (1982).

Some Defendants (not Harvey) also argue that paragraph 2 of the authorization order (Defendant's Exhibit No. 4) limits the Assistant Attorney General's authorized power to those situations under § 2518(7) dealing with emergencies. The plain reading of the statute demonstrates that the authority is contained *in the conjunctive* and does not limit the power of the Assistant Attorney General to the specific emergency situations but instead permits the Assistant Attorney General to have additional authority to act specifically in emergency situations. This wiretap was not authorized under the § 2518 emergency provision and the language in paragraph 2 of the authorization order is not applicable.

Section 2516 sets up a procedure for authorization to submit an application to a judge. It does not set forth the criteria for making application to a judge; rather, it defines the requirement of obtaining the Attorney General's authorization. Therefore, Defendant's argument that it was improper for the Assistant Attorney General to authorize U.S. Attorney Atlee Wampler, who in turn allegedly improperly authorized Assistant U.S. Attorney Stephen Gillman, is without merit. *United States v. Bowdach,* 366 F.Supp. 1368 (S.D.Fla.1973), *aff'd* 501 F.2d 220 (5th Cir.1974), *cert. denied,* 420 U.S. 948, 95 S.Ct. 1331, 43 L.Ed.2d 426 (1975).

Therefore, the authorization to apply for the subject order and its extensions was validly in force and exercised.

## III. AUTHORIZATION OF F.B.I. AGENTS TO INVESTIGATE DRUG–RELATED OFFENSES

■ 18 U.S.C. § 2516 provides that applications may be made for authority by the FBI, or a federal agency having responsibility for the investigation of the offense as to which the application is made, to conduct the wiretap surveillance. Defendants argue that since § 2518(4)(d) requires that the identity of the agency authorizing the intercept of the communication be set out in the order of authorization and since § 2510(7) defines an investigative or law enforcement officer to mean an officer empowered by law to conduct investigations for offenses under § 2516, the Court's order was invalid. Defendants argue that the order purported to authorize FBI personnel to conduct drug-related surveillance when responsibility for investigating those offenses lies with the DEA and not the FBI. Defendants argue that the FBI does not have jurisdiction over drug investigations and therefore the wiretap order was invalid since it authorized the FBI to conduct drug-related surveillance.

The Government argues that neither the language of the statute nor the legislative history support the Defendants' contention that the Act restricted the FBI's wiretap authority to only those offenses which are within the exclusive jurisdiction of the FBI. First, it should be noted that among the offenses to be investigated by the Order (Defendant's Exhibit No. 4 and amended Order, Defendant's Exhibit No. 5) is RICO, which Defendants do not argue is outside the FBI's jurisdiction.

The basic offenses involved a violation of 18 U.S.C. §§ 1961 and 1962 (RICO) which clearly entail a series of drug-related crimes. *See United States v. Phillips,* 664 F.2d 971 (5th Cir.1981). Moreover, the RICO allegation in this investigation was not limited to strictly drug-related offenses. It also allegedly involved bribery of public officials, murder, stolen car engines and conspiracy to commit murders, each consti-tuting a separate violation of Florida Statutes. (Defendant's Exhibits Nos. 2 & 3). The investigation of these offenses provided a jurisdictional basis within 28 U.S.C. § 501, *et seq.* and 28 C.F.R. § 0.85.

A review of the legislative history to § 2516(1) supports a "plain meaning" interpretation as to the responsibilities envisioned for the FBI in the investigation of such offenses. The Senate Judiciary Committee Report, S.Rep. No. 1097, 90th Cong., 2nd Sess. 97 (1968), U.S.Code Cong. & Admin.News 1968, pp. 2112, 2186 explains § 2516(1) as follows:

> The order of authorization may permit the Federal Bureau of Investigation or the Federal agency having responsibility for the investigation of the offense involved to intercept the wire or oral communication. The Department of Justice under the leadership of the Attorney General must be the central focal point of any drive against organized crime, particularly in the collection, analysis, and dissemination of information. It is appropriate that no limitation be placed on the investigations in which the investigative arm of the Department may participate. Organized crime has not limited itself to the commission of any particular offense. No limitation should be placed on the Department of Justice.

This passage speaks of possible judicial authorization of interceptions by "the Federal Bureau of Investigation or the Federal agency having responsibility for the investigation of the offense...." It does not indicate that the FBI must have general investigative responsibility for a given offense before it may be authorized under § 2516(1) to participate in an interception directed at such an offense.

■ Section 2516 and the legislative history demonstrate that it was not necessary for the FBI to have specific investigative responsibilities for specific offenses before it could participate in court-approved inter-

ceptions directed at those offenses involved herein. The Defendant's argument does not find support in either the statute or the history of the Act.

## IV. MARIJUANA–RELATED DRUG OFFENSES MAY BE PREDICATE RACKETEERING ACTS UNDER RICO

■ Defendant candidly concedes (p. 1060) that decisions in this circuit have found marijuana-related drug offenses to fall within RICO, 18 U.S.C. § 1961(1)(D) ("any offense involving ... the felonious ... importation ... or otherwise dealing in narcotics or other dangerous drugs ...") *See, e.g., United States v. Phillips,* 664 F.2d 971, 1039–40 (5th Cir.1981) ("Marijuana may be the subject matter of a RICO charge.")

Decisions in this circuit have held that marijuana-related drug offenses fall within RICO. *United States v. Phillips, supra.* While Defendant goes on to detail the basis for his contention that such decisions are in error, this Court is nevertheless bound by them until an *en banc* Eleventh Circuit holds otherwise. *See Bonner v. City of Prichard, Alabama,* 661 F.2d 1206 (11th Cir. 1981) (*en banc*).

## V. PROBABLE CAUSE FOR THE OCTOBER 20, 1980 ORDER

1. *Sufficiency of probable cause in the Affidavit itself.*

This subsection will treat Defendants' attack upon the sufficiency of the affidavit to establish probable cause within its four corners; except that there is excluded, at this point, all matters relating to the sufficiency of missing page 21C and its context within the affidavit and under *Franks v. Delaware, infra.* This latter exception will be discussed later in this Opinion.

Under *Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–2685, 57 L.Ed.2d 667 (1978), there is a presumption of validity with respect to the affidavit supporting a search warrant or court order for electronic surveillance. To mandate an evidentiary hearing, the challenger's attack must be supported by more than conclusory allegations, and must be supported by more than a mere desire to cross-examine. A defendant seeking an evidentiary hearing on the probable cause shown by affidavits presented to the court must make "a substantial preliminary showing that the *statements* in the *affidavits* concerning facts material to the finding of probable cause are *deliberately false* or *made with reckless disregard for the truth.*" *United States v. Licavoli,* 604 F.2d 613, 621 (9th Cir.1979), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787. The allegations of deliberate falsehood or reckless disregard for the truth must be accompanied by an offer of proof which points out specifically the portion of the warrant affidavit that is claimed to be false and should be accompanied by a statement of supporting reasons. *Franks, supra.* Affidavits or sworn or otherwise reliable statements of witnesses should be furnished or their absence satisfactorily explained— allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted by *Franks* is only that of the affiant, not of any non-governmental informant. And, finally, if the above requirements are met and if when material that is the subject of the alleged falsity or reckless disregard is set to one side there remains sufficient content in the application to support a finding of probable cause, no hearing is required. *See also, United States v. Jeffers,* 621 F.2d 221, 227 (5th Cir.1980).

Here, no basis for an evidentiary hearing was established and, in fact, no evidentiary hearing was requested as to the sufficiency of probable cause within the boundaries of the affidavit, *except* as to the attack founded upon missing page 21C.

■ The same probable cause standard which exists for search warrants is applicable to wiretaps: probable cause exists where the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a

man of reasonable caution to believe that an offense is being committed, has been committed or is about to be committed. 18 U.S.C. § 2518; *Berger v. New York,* 388 U.S. 41, 55, 87 S.Ct. 1873, 1881, 18 L.Ed.2d 1040 (1967). There need only be a probability of criminal activity rather than a *prima facie* showing. In issuing the order the judge must exercise his own judgment, gleaned from a common-sense reading of the entire affidavit, as to whether the facts alleged constitute probable cause. When the judge or magistrate acts in this manner, his determination as to probable cause is conclusive in the absence of arbitrariness— *i.e.,* a judge's determination of probable cause should be accorded great deference by reviewing courts as long as he performed his independent function and did not merely serve as a rubber stamp for the police. *Bastida v. Henderson,* 487 F.2d 860, 863 (5th Cir.1973); *United States v. Hyde,* 574 F.2d 856, 862 (5th Cir.1978); *United States v. Marcello,* 508 F.Supp. 586, 602–603 (E.D.La. 1981).

▌ However, when, as here, much of the information in the affidavit comes from confidential informants, the magistrate's or judge's search must be guided by and measured against the standards set forth in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), as interpreted by the Fifth Circuit in *United States v. Squella-Avendano,* 447 F.2d 575 (5th Cir.), *cert. denied,* 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971). *Aguilar* requires that the affidavit set forth: (1) the underlying circumstances from which the informant concluded that criminal activity was afoot and, (2) the underlying circumstances from which the affiant concluded that the informant was credible or the information reliable.

▌ The first prong of the *Aguilar* test concerning reliability can be established if the informant's past reliability is known. This enables the court to judge the reliability of the current information already obtained. If information from an infor-

mant produces fines, savings, recoveries and arrests, they will be attributed to the source as his past record. Thereafter, law enforcement officers can be fairly certain they will have future information from a source with an already proven record of accomplishment. In the instant case, both sources # 1 and # 2 contained in the affidavit have built a track record of reliable information which culminated in numerous law enforcement statistics. (¶¶ 27, 28.) Based on their past records, it was possible for Judge Spellman to estimate that their reliability would be no less in this case.

The second prong of the *Aguilar* test, namely, whether an informant's tip contains the underlying circumstances from which he arrived at his information, is equally important to establishing probable cause. The affidavit in support of the order delves into great detail as to how source # 1 came into possession of his information. (¶¶ 29–36.) It is replete with instances of personal knowledge including eyewitness accounts of criminal wrongdoing by certain Defendants. (¶¶ 34–37.) Other inputs by source # 1 as to underlying circumstances relate personal contacts with Defendants in which they admit criminal conduct, such as when one of the Defendants advised source # 1 of the details as to how offload personnel are paid for their services. (¶ 33.) Moreover, source # 2 also has personal knowledge of the information contained in the affidavit. Any observances which were less than actual criminal conduct on the part of the Defendants were minimal. Even those instances are bottomed on occasions when defendants told the source about their narcotics activity or showed the source evidence of narcotics activity (see ¶ 74, where source # 2 was shown from 3 to 4 million dollars by William Joseph Harvey and told it was from his narcotics transaction).

In *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the Supreme Court held that the *Aguilar* test of reliability could be enhanced by law enforcement corroboration of limited aspects of the informant's report through the use of

independent sources. See also United States v. Weinrich, 586 F.2d 481 (5th Cir. 1978), cert. denied, 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979). That this very tool was employed on numerous occasions is evidenced by the instant affidavit which indicates many surveillances by the FBI and attempts at corroboration of source information through independent investigation. Such examples of independent evaluators taken by themselves do not purport to suggest criminal wrongdoing, but, when added to source information, have the corroborative effect of supporting that information. Spinelli, supra, 393 U.S. at 418, 89 S.Ct. at 590; United States v. Hirschhorn, 649 F.2d 360 (5th Cir.1981); United States v. Escandar, 319 F.Supp. 295, 304 (S.D.Fla. 1970). In most cases it is the detail provided by the information in combination with the corroboration by independent investigation that satisfies the court's concern with credibility and reliability. United States v. Cummings, 507 F.2d 324 (8th Cir.1974); United States v. Sellers, 483 F.2d 37 (5th Cir.1973), cert. denied 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212 (1974). Both sources # 1 and # 2 had furnished information to the FBI over a protracted period of time which, when taken by itself, displayed intimate detail that could come only from persons who were integrally situated within the circle of Defendants' activities. This information, when combined with the FBI's independent corroboration of much of the information through verification of non-incriminating facts, would lead a man of reasonable prudence to believe that an offense has been committed based upon the facts and circumstances contained in the affidavit. See Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Defendant Sikes attempts to discredit the affidavit by taking issue with isolated instances within the probable cause summary. His allegation that paragraphs 20, 21 and 23 are not specific enough is unwarranted, however, as those items are merely part of the "BACKGROUND" section. Defendant Harvey's attacks on probable cause take place in the statement of facts where certain items are branded as nebulous and other substantial items are simply glossed over. In fact, the only specific attack by either Harvey or Sikes' motion is on paragraph 74c where source # 2 heard several people in a bar talking about offloads. Sikes, however, omits the specificity contained in the paragraph which described the amount of marijuana, the two locations, the three individuals in charge, and the corroborative source information that Harvey had "a business deal in Miami." (¶ 74.) In any event, source # 2 as well as source # 1 and the "concerned citizen" each provide specific, detailed, corroborated and reliable information throughout the affidavit. The description of each source's reliability (see ¶¶ 27–28) provides a textbook example of vouching for an informational source.

This is in strong contrast with the case of United States v. Hyde, 574 F.2d 856 (5th Cir.1978), wherein the court upheld an affidavit in which the sole verification of the confidential informants was that they were "believed to be reliable." It also is clear, from a thorough reading of the affidavit, that the source information comes not from "double hearsay", as Sikes contends, but in the form of first person observations of, and conversations with, the principal subjects. The affidavit is replete with direct evidence supplied not only by the unnamed witness but also by such named individuals as Cheryl Campbell, Demetria Leiman, Robin Sorrentino, Janet Harris, Michael Sorrentino, Frank Wilt and Jerry Siciliani. As the Fifth Circuit has stated in assessing defense attempts to scrutinize a surveillance affidavit:

We must also be mindful that probable cause is the sum total of layers of information and the synthesis of what police have heard, what they know, and what they observed as trained officers. We weigh not individual layers, but the laminated total.

United States v. Weinrich, supra [586 F.2d 481] at 490; quoting United States v. Edwards, 577 F.2d 883, 895 (5th Cir.1978) (en banc). Even when no particular source is found to be reliable, the fact that a number of informants come forward will supply

probable cause. *See United States v. Hyde, supra,* 574 F.2d at 863. It is also clear that an individual who is a bystander or victim-eyewitness to criminal activity does not have to meet the *Aguilar-Spinelli* requirements. *United States v. Cifarelli,* 589 F.2d 180 (5th Cir.1979). The volume of reliable information within the 43-page affidavit of Agent Copus simply cannot be overcome by the Defendants' arguments. It is adequate in every sense to meet the tests and requirements necessary to support the electronic surveillance orders, with or without missing page 21C.

### 2. *Scope of RICO.*

■ Defendant Harvey argues that to warrant the surveillance under RICO the Government had to show that each named subject agreed personally to commit two or more predicate offenses and that an enterprise existed which was composed of a group of persons associated together for the common purpose of engaging in a course of conduct. Harvey asserts that there has not been the requisite showing in the affidavits that the persons to be the subject of the electronic surveillance agreed to commit personally two predicate offenses. However, the Government need not prove a *prima facie* case of RICO conspiracy in the application but need only show the probable cause standard of probability that there was, is, or will be a RICO violation. Similarly, if applied to Harvey's assertion that the Government did not show the existence of an enterprise, here again, the Government is not required to prove that such an enterprise existed, rather, the Government need establish only that there was probable cause to believe that RICO violations existed.

A warrant will not be invalidated by interpreting an affidavit in a hypertechnical sense inasmuch as the affidavit should be viewed in a common sense manner. Considering the affidavit in its entirety, there was probable cause to believe that the persons to be electronically surveilled were part of an enterprise which was engaging in the commission of the predicate offenses and also probable cause to believe that Har-

vey had agreed to participate in the enterprise through commission of two or more predicate offenses.

Other Defendants argue that there was an insufficient showing of probable cause as to that particular defendant. Although § 2518(1)(b) requires inclusion in the application of the identity of persons, if known, whose communications are to be intercepted, this provision is interpreted to place a limit on the Government's right to obtain a wiretap and information about someone whom they knew in advance was committing the crimes charged and would probably be intercepted. It seeks to prevent the Government from failing to disclose the names of individuals who would probably be intercepted. Defendants argue that the affidavit must set forth sufficient facts for the issuing judge to conclude that there is probable cause to believe that each person named as a person whose conversations would probably be intercepted committed the offenses. This argument was rejected in *United States v. Martin,* 599 F.2d 880, 884–85 (9th Cir.), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979), wherein the court rejected this restrictive approach by holding that an order can issue upon a probable cause showing with respect to *an* individual (here, Harvey), but the statute does not require a similar showing as to each person named in the application.

### 3. *Continuation of future conversations about past bribes, homicides, etc.*

Defendant Harvey argues that there was no showing in the affidavit that there would be future conversations in the Delray Towing office about past bribes or homicides, but rather only a showing that there may be future conversations about marijuana ventures. In addition to the narcotics offenses, the affidavit names other offenses such as murder, bribery, the corruption of a Coast Guard officer and stolen race car engines. The offenses are part and parcel of Harvey's criminal enterprise, the foundation of which was drug smuggling. The Defendant's contention that the Government's proof was only that such events had taken place in the past and would not pro-

vide future evidence is a distinction without a difference. Probable cause exists where the affiant's evidence would support a reasonable belief that an offense has been or is being committed. *United States v. Flynn,* 664 F.2d 1296, 1304 (5th Cir.1982). The affidavit, taken in its entirety, shows a criminal enterprise that committed crimes in the past and would do so in the future. It is inherent in such an enterprise that other crimes would be necessary and plans to commit them as well as measures to cover them up would be forthcoming. Courts will not invalidate a warrant by interpreting an affidavit in a hypertechnical, rather than common-sense manner. *See Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). That such conversations would occur in the office of William Joseph Harvey at Delray Towing is amply demonstrated throughout the affidavit. Source # 2, (¶¶ 62, 63, 64, 66, 68 and 74B), Cheryl Campbell (¶ 75a), Demetria Leiman through Arthur Sakell (¶ 76), and Janet Harris through John Harris (¶ 124), each described the office as the meeting place for Harvey's criminal activity discussions. That fact was reinforced by FBI surveillance and the many details provided by Source # 2. Evidence thus collected must be seen and weighed as understood by those versed in the field of law enforcement. *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

This probable cause attack is without merit.

4. *Staleness of the probable cause.*

■ Defendant Harvey next argues that the initial probable cause, if it existed, became stale during the first 30-day period of the electronic surveillance because the first three 5-day progress reports did not show any progress. The electronic surveillance was in place on October 24, 1980. The first report on October 29, the second report on November 4, and the third report on November 11, 1980 (at 5-day intervals), each showed no significant conversations. However, the progress report of November 20, showed significant conversations, commencing November 18, 1980.

Harvey claims that even if there was initial probable cause, it became stale since no relevant conversations were intercepted until November 18, 1980. Section 2518(6) provides that a judge *may* require progress reports to be made. *United States v. Iannelli,* 477 F.2d 999, 1002 (3d Cir.1973), *aff'd* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), held that the sufficiency of progress reports was a matter for the supervising judge and his discretion to permit the continuation of the surveillance when reports are sketchy, must be viewed in light of the fact that there is no requirement for such reports by the statute. Also, the activities in which Harvey was alleged to be engaged were part of an ongoing narcotics operation, not merely a one-time incident. Therefore, since the very conduct which the surveillance seeks to disclose is of a protracted or continuing nature, the time element is of less significance. *See United States v. Weinrich, supra; United States v. Hyde,* 574 F.2d 856, 865 (5th Cir.1978); *United States v. Tucker,* 638 F.2d 1292, 1299 (5th Cir.), *cert. denied,* 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981).

The facts of this case indicate an ongoing narcotics conspiracy. Aside from speculation or strong suspicion on the part of agents from the FBI, the evidence in the affidavit shows a conspiracy dating back to May, 1979 (¶¶ 39–43), and continuing through September 23, 1980. (¶ 74C.) Actually, the last information was the arrest of Robert Gainer Jernigan and the departure of William Joseph Harvey which was learned of on October 14, 1980. The initial wire interception order was forwarded to Judge Spellman October 17, 1980, and signed October 20, 1980.

In *United States v. Weinrich, supra,* the court stated the basic rule in determining staleness:

In general, the basic criterion as to the duration of probable cause is the inherent nature of the crime. . . . [w]here an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. *On the other hand, if an*

*affidavit recites activity indicating protracted or continuous conduct, time is of less significance.* (emphasis supplied).

586 F.2d at 491. This reasoning was followed by the Second Circuit in a similar case, *United States v. Martino,* 664 F.2d 860 (1981); *see also, Bastida v. Henderson,* 487 F.2d 860, 864 (5th Cir.1973).

Probable cause is not determined by a ritualistic counting of the number of days since the last information and the warrant's issuance. *United States v. Kirk,* 534 F.2d 1262, 1274 (8th Cir.1976), *cert. denied,* 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091 (1977). Each case must be determined on its own facts. *United States v. Martino, supra; United States v. Diecidue,* 603 F.2d 535, 560 (5th Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980). It must be noted, however, that the number of days in the instant case (27) is comfortably within the time factors courts have mentioned in determining staleness. [See *Hyde, supra,* 20–46 days; *Weinrich, supra,* 20 days; *United States v. Barfield,* 507 F.2d 53 (5th Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1684, 44 L.Ed.2d 105 (1975), 40 days; *Martino, supra,* 22 days.] This holding applies even in the absence of the instant added factor of protracted and continuous criminal conduct, a factor which renders time of less significance. *Bastida v. Henderson,* 487 F.2d 860, 864 (5th Cir.1973).

The Fifth Circuit, in *United States v. Hyde,* 574 F.2d 856, 865 (1978), considered the above doctrine in relation to a wiretap application used in an investigation of ongoing narcotics trafficking:

> The upshot of this rule in practical application has been to allow a fairly long period of time to elapse between information and search warrant in cases where the evidence clearly shows a longstanding, ongoing pattern of criminal activity. This result is even more defensible in wiretap cases than in ordinary search warrant cases, since no tangible objects which can be quickly carried off are sought.

The court then had no trouble finding that, in a conspiracy that had lasted over two years, information that was less than two months old was not stale.

There is no merit to the argument with regard to staleness.

5. *Necessity showing for the order was inadequate (use of alternative investigative techniques).*

 Harvey alleges that the statements of FBI Agent Copus on the need for interception in ¶¶ 130–144 do not meet the statutory requirements of § 2518(3), that less intrusive/normal investigative techniques have failed, probably would fail, or are too dangerous. Harvey alleges that Copus was not an expert in drug investigations so his statements cannot be viewed as expert testimony on the subject and that the reasons given are inadequate: informants are afraid and unwilling to testify; the defendants have evaded detection and surveillance; difficulty of conducting physical surveillance; not able to place an agent in the operation; grand jury immunity techniques would be unfruitful; and a search warrant would be ineffective.

 The purpose of § 2518(3) is to inform the issuing judge of the difficulties involved in the use of commonplace techniques. *United States v. Robertson,* 504 F.2d 289 (5th Cir.1974), *cert. denied,* 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778 (1975). The more traditional techniques need not be exhausted if they are impractical or costly and inconvenient. *Id.* It is also true that the determination that other investigative techniques will not succeed may not be based upon affidavits that include only bare conclusory statements. *United States v. Martinez,* 588 F.2d 1227, 1231 (9th Cir.1978).

The affidavit clearly meets the tests set out in the statute and case law. Agent Copus is an FBI agent who has been assigned for the two previous years to other narcotics investigations. Additionally, the affidavit is not merely conclusory but states the reasons why traditional methods have failed and would fail.

There is a sufficient basis for the Order's conclusion that the traditional methods

would not be successful, and since the government's burden of establishing compliance with this section is not great and considerable discretion rests with the issuing judge in deciding whether other investigative techniques might be successfully employed, there has been an adequate showing by the government that other methods have failed or reasonably appear to be unlikely to succeed if tried or would be too dangerous. *See United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir.), *cert. denied*, 434 U.S. 855, 98 S.Ct. 174, 54 L.Ed.2d 126 (1977); *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir.1976).

As the Fifth Circuit has pointed out, § 2518(1)(c) and (3)(c) must be read in a common sense fashion. They are "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. De La Fuente*, 548 F.2d 528, 537–38 (5th Cir.), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977), *quoting United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). The statute does not require that all possible techniques be tried before a wiretap may be authorized. *See United States v. Martino*, 664 F.2d at 868, and cases cited therein. Rather, its purpose is simply to inform the issuing judge of the difficulties involved in the use of conventional techniques. *United States v. Pacheco*, 489 F.2d 554 (5th Cir. 1974), *cert. denied*, 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975). The provision contemplates that the showing be tested in practical and common sense fashion. S.Rep. No. 1097, 90th Cong., 2d Sess., 100 U.S.Code Cong. and Admin.News (1968), pp. 2112, 3290; *United States v. Robertson, supra*. The Fifth Circuit also has stated in *United States v. McCoy*, 539 F.2d 1050 (5th Cir.1976), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977), that in order to uphold the wiretap order the affidavit need only supply a "factual predicate" adequate to support the judge's implicit finding that investigative procedures appear unlikely to succeed.

Both Sikes and Harvey have filed motions which state that there was insufficient necessity to utilize electronic surveillance. Both fail to supply a *reasonable* alternative upon which the government could have proceeded. An item by item breakdown of the Defendants' argument, in concert with the respective responses by the Government, reveals a lawful basis for the surveillance pursuant to § 2518(1)(c) and (3)(c). As numerous courts have stated, it is a difficult proposition to be very specific when one endeavors to prove a negative such as the Defendants suggest. Courts will not set unduly burdensome standards on the Government's demonstration that no reasonable alternative existed. *See United States v. Steinberg*, 525 F.2d 1126 (2d Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). Considerable discretion rests with the issuing judge in deciding whether other investigative methods might have been successfully employed. *United States v. Landmesser*, 553 F.2d 17 (6th Cir.), *cert. denied*, 434 U.S. 855, 98 S.Ct. 174, 54 L.Ed.2d 126 (1977); *United States v. Smith*, 519 F.2d 516 (9th Cir.1975); *United States v. Daly*, 535 F.2d 434 (8th Cir.1976). Also, as stated in *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir.1976): "the government's burden of establishing its compliance with [subsection 2518(1)(c)] is not great." *See also, United States v. Askins*, 351 F.Supp. 408, 414 (D.Md.1972).

Defendant Harvey alleges that the qualifications of FBI Agent Copus in the area of drug-related investigations somehow render his evaluation of alternative procedures insufficient. His allegation that Copus lacks the expert abilities necessary in this case ignores the affidavit which states Copus' qualifications to investigate RICO violations and apply for the instant order under 18 U.S.C. § 2510(7). Further, the affidavit documents Copus' two years of experience in the area of complex narcotics importation and distribution conspiracies. (¶¶ 1–2.) Harvey's allegation concerning Copus' lack of drug related training does not stand up in light of the affidavit and the further explanation that Copus was stationed at the

Drug Enforcement Agency for two years working on solely drug-related offenses. Additionally, the Defendant cites no legal basis for his theory that an affidavit by an individual with even *no* training in the drug-related field (assuming this was a totally drug-related case) would render an otherwise proper affidavit insufficient.

Normal investigative techniques have been amply demonstrated by the Government to be inadequate for the circumstances which necessitated and gave probable cause for issuance of the electronic surveillance here.

## VI. SEALING REQUIREMENTS

■■ Defendants Harvey, Sikes and co-defendants contend that the sealing requirements of § 2518(8) were not fulfilled in that no directions were contained in the order as to the care, custody or sealing of tapes and because the original intercepted tapes from the October 20, 1980 initial 30-day period were not sealed until January 23, 1981. Some defendants also maintain that they did not receive an inventory following the termination of the wiretaps.

Section 2518(8) provides that "immediately upon the expiration of the period of the order, or extensions thereof, such recordings should be made available to the judge issuing such order and sealed under his direction. Custody of the recordings shall be wherever the judge orders." Here, the tapes were sealed on January 23, 1981, three (3) days after the termination of the last intercept order (Defendant's Exhibits 59(b) and 42). Case law clearly holds that the tapes do not have to be sealed until the end of the extension orders, i.e., at the termination of the entire surveillance. *United States v. Scafidi,* 564 F.2d 633, 641 (2d Cir.1976), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 401 (1978); *United States v. Vazquez,* 605 F.2d 1269, 1275–76 (2d Cir.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979). A delay of three (3) days after termination is reasonable and acceptable under the statute. *United States v. Sklaroff,* 506 F.2d 837, 840 (5th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 142,

46 L.Ed.2d 105 (1975) (delay of fourteen (14) days with no showing of prejudice to the defendants).

Defendants also contend that the initial authorization order must specify the procedures for sealing, care and custody of the tapes. The Act does not so state. Such a procedure may be prudent but there is no requirement that it be followed or included. *United States v. Gigante,* 538 F.2d 502, 507 (2d Cir.1976). The Government contends, and there appears nothing to contradict it, that the tapes were preserved and maintained in a manner equivalent to that in *United States v. Abraham,* 541 F.2d 624 (6th Cir.1976). The tapes were locked in an FBI evidence vault until January 23, 1981, when they were sealed in the presence of the Honorable Eugene P. Spellman (Defendant's Exhibit 59–B.) The propriety of the sealing of the tapes was demonstrated in open court on June 30, 1982, when, after notice to all Defendants, two of the five boxes of the tapes were opened. All seals which bore the signature of Judge Spellman were intact. This complies with the standard set forth in § 2518(8). The Congressional purposes in the sealing requirements were to safeguard recordings from editing or alteration and to maintain the confidentiality of the recordings. *United States v. Mendoza,* 574 F.2d 1373, 1376–77 (5th Cir.), *cert. denied,* 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978). The real determination therefore is merely whether the tapes were properly and expeditiously sealed, the seals kept intact and the cartons kept in a secure area. There has been no evidence adduced which would taint any of the foregoing requirements nor furnish a basis to suppress for improper sealing requirements.

■■ Time for service of notice of inventory under § 2518(8)(d) was extended by court order to July 18, 1981. The statute requires no more than reasonable efforts to reach persons within the Act's inventory group. Suppression is mandated only if the defendants receive notice on the eve of trial and were able to show prejudice resulting from the delay or non-compliance. *United v. Lawson,* 545 F.2d 557, 564 (7 Cir.1975).

No prejudice has been shown from failure to receive a notice by any defendant.

According to the government, the deadline for service of inventory was July 18, 1981 (Defendant's Exhibit 45–B.) On July 13, 1981, a letter post-marked July 15, 1981, was sent to Joseph William Campbell who raises this issue of failure to furnish notice of inventory at his last known address by certified mail. The letter was returned "unclaimed". (See Exhibit AS submitted by the government with Omnibus Response.) Defendant Campbell received notice some time between July 15, 1981, and September 9, 1981 (See Exhibit AT as submitted by government with Omnibus Response.) There is no basis upon which to suppress on this ground raised by Campbell.

## VII. THE ORDER OF NOVEMBER 20, 1980 WAS ALLEGEDLY INVALID

### 1. Carry-Over Objections.

By reference thereto, the Defendants carry over their objections raised to the October 20, 1980 order relating to the various issues above-discussed. For the reasons previously enumerated the same rulings apply here and the carry-over objections are deemed to be inadequate and insubstantial.

### 2. Insufficient probable cause for an extension.

■ Defendant Harvey claims that there was no showing of a RICO enterprise or an agreement involving Defendant Harvey in the initial 30-day intercept. However, the government can rely on the conversations intercepted during the initial surveillance to provide probable cause for renewal as well as relying upon the probable cause supplied in the initial application. The issue is whether the progress reports, initial application and application for extension and the affidavits of the initial and extension orders support a finding of probable cause. Since the progress reports during the first 30-day period from November 18, 1980 onward indicate conversations dealing with drug transactions, there is an even stronger showing of probable cause as to those offenses in support of the first exten-

sion order. *United States v. Fury,* 554 F.2d 522 (2d Cir.1977), *cert. denied,* 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978). Further, it is permissible that a wiretap continue until the government accumulates enough evidence to determine the scope of the conspiracy and the identity of the individuals involved. *See United States v. McCoy,* 539 F.2d 1050 (5th Cir.1976), *cert. denied,* 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977).

### 3. Was the district judge without authority to execute an extension order outside his territorial jurisdiction but operative within his territorial jurisdiction?

■ In the instant case, Judge Spellman signed the original surveillance order of October 20, 1980, in Miami, Florida. (Defendant's Exhibit 4.) During the week of November 20, 1980, Judge Spellman, along with other judges of the Southern District of Florida, was in Sarasota, Florida (Middle District of Florida), attending a judicial seminar. FBI Agents Harold Copus and Stephen Conger, along with Assistant U.S. Attorney Stephen Gillman, went to Sarasota where the order of November 20 was presented. Judge Spellman called the Administrative Office and was apprised that he had authority to entertain the extension application in Sarasota, Florida (Defendant's Exhibit 54A), dated November 21, 1980.

When reviewing judicial authority under 18 U.S.C. § 2518, an examination of the authority provided to judges/magistrates to issue search warrants under Rule 41, Fed.R. Crim.P., is relevant. The similarity between the wiretap statute and the rule governing search warrants is obvious. Both provisions require that government applications be made to judicial officers and be supported by sworn testimony or affidavits. *Compare,* 18 U.S.C. § 2518(1) and Rule 41(c)(1), Fed.R.Crim.P. Likewise, an order or search warrant must meet the constitutional mandates of probable cause and particularity as reflected in *United States v. Donovan,* 429 U.S. 413, 427–28, 97 S.Ct. 658, 667–668, 50 L.Ed.2d 652 (1977); *see also,* 18

U.S.C. § 2518(3) and (4) and Rule 41(c), Fed.R.Crim.P. Finally, Congress intended that 18 U.S.C. § 2518 be interpreted in light of existing law under Rule 41. S.Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.Code Cong. & Ad.News 2112, 2189. This analogous treatment of wiretap applications and search warrants provides the basis for allowing federal judges while physically outside their territorial jurisdiction to authorize wiretap extensions which will be executed within the territorial district of the judge.

The specific issue of a federal magistrate's authority to sign a search warrant outside his territorial jurisdiction was addressed in *United States v. Strother*, 578 F.2d 397 (D.C.Cir.1978). The court noted that "[j]udges have proverbially signed papers or done other acts outside their territorial jurisdiction which have effect—and can only have effect—within those respective jurisdictions." *Id.* at 400. In interpreting the language of Rule 41(a), the court focused its attention not on the physical location of the judge when signing an order but on the judge's authority where the order will be executed. The court stated that ". . . the search warrant can only be operative in the territory in respect of which the issuing officer is clothed with judicial authority. It is not intended, we believe, to require that under all circumstances the physical acts involved in the issuance of a warrant be performed in that territory." *Id.* at 399 (footnote omitted); *See also United States v. Gomez*, 495 F.Supp. 992, 1012 (S.D.N.Y.1979), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981).

It is the place of execution, not the location of the judge, which determines the authority of a judge to issue a court order. In the instant case, Judge Spellman authorized, on November 20, 1980, the extension of a surveillance order for an office located within his judicial district, the Southern District of Florida. Moreover, this same district judge had previously authorized the initial order of October 20, 1980.

The Court takes judicial notice that for many years past and including the calendar year 1980, there was in effect a blanket order issued by the Chief Judge of the U.S. Court of Appeals for the Eleventh Circuit (Fifth Circuit) cross-designating each district judge in each district of Florida with judicial authority to sit in every other district in Florida without further order. Here, Judge Spellman did even less by executing an order operative within his own district, although executed in another district of Florida.

Judge Spellman's extension order of November 20, 1980 was valid.

## VIII. THE ORDER OF DECEMBER 19, 1980 WAS ALLEGEDLY INVALID

1. *Carry-Over Objections.*

Here again, the Defendants readopt their arguments that the October 20, 1980 order and the November 20 extension were invalid on the basis of grounds previously enumerated. The same rulings of this Court are applied and the order and extension are deemed to be valid.

2. *Prior failure to name Defendant Kay as a target.*

Defendant Kay was not listed in the initial October 20 application and order nor in the November 20 extension application and order as a person known to be committing the offenses for which the surveillance is sought and whose communications are to be intercepted. 18 U.S.C. § 2518(1)(a). However, in the December 4, 1980 progress report the Government informed the judge that they had identified Kay as a person whose oral communications may be intercepted. Accordingly, in the December 4 progress report and in the December 17, 1980 application for an extension of the court's surveillance authorization the Government sought authorization to intercept Kay's conversations. This authorization was subsequently granted by Judge Spellman in his December 19, 1980 order authorizing the continued interception.

The Court finds from the evidence introduced at the suppression hearing that the FBI only identified Kay as a person known to be committing the offense and whose

conversations are likely to be intercepted on or about December 2, 1980. The Court also finds that the December 17 extension application and December 19 order continuing interception comported with § 2518(1)(a). *United States v. Kahn,* 415 U.S. 143, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). Accordingly, there is no basis for suppression for failure to include .Defendant Kay in earlier applications and orders as a "target" of the surveillance and the evidence obtained by the surveillance both before and after the December 19, 1980 order can be used against him. *United States v. Hyde,* 574 F.2d 856 (5th Cir.1978); *United States v. Scafidi,* 564 F.2d 633 (2d Cir.1977).

## IX. ALLEGED § 2517(5) VIOLATION (DISCLOSURE OF TITLE III INTERCEPT AS TO A § 848 OFFENSE)

Defendant Harvey argues that because 21 U.S.C. § 848 was not specifically cited in the application, incorporated affidavit, and/or the order authorizing the interception, an order granting authorization to disclose the intercepted communications to the grand jury and at trial in relation to a § 848 offense was necessary under § 2517(5). For the reasons set forth below, the Court concludes that no violation of § 2517(5) occurred. Although some of the relevant facts have been set out *supra,* a further brief review of the pertinent facts is helpful.

On October 17, 1980, application was made to United States District Judge Eugene P. Spellman by Assistant U.S. Attorney Stephen B. Gillman for an order authorizing the interception of oral communications of Defendant Harvey and other named individuals, as well as other persons then unknown. Said application was supported by an extensive and detailed affidavit by FBI Agent Harold Copus setting forth probable cause to believe that Defendant Harvey and ten (10) other persons had been and were then operating a large-scale marijuana smuggling enterprise. The situs of the intercepted communications was to be Defendant Harvey's office at Delray Towing Service, Inc. in Delray, Flor-

ida. The application stated that the subject communications described therein concerned violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of narcotics); 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and to distribute narcotics); and 18 U.S.C. § 1962(c), (d) (conducting and conspiring to conduct the affairs of an enterprise, the activities of which affected interstate and foreign commerce, through a pattern of racketeering activity). The predicate offenses relating to 18 U.S.C. § 1962 were enumerated as violations of 21 U.S.C. § 841(a)(1) and § 846; bribery in violation of Chapter 838 of the Florida Statutes; dealing in narcotics or dangerous drugs in violation of § 893.13 of the Florida Statutes; and murder and conspiracy to commit murder in violation of §§ 782.04 and 777.04 of the Florida Statutes.

On October 20, 1980, based on the application and accompanying affidavit of Agent Copus, Judge Spellman entered an order authorizing the interception of oral communications of the subject individuals relating to the named offenses, and in particular, concerning narcotics transactions, past and future bribery arrangements, narcotics-related murders, the identities of confederates, the subjects' places of operation, and the full nature and scope of the conspiracy described in the application and affidavit. At five (5) day intervals between October 20, 1980 and November 20, 1980, Judge Spellman received progress reports describing the results of the electronic surveillance. On November 20, 1980, an application was submitted to Judge Spellman for an extension of the October 20, 1980 order. The application sought continued authorization to intercept oral communications concerning the same violations as those enumerated in the October 17 application. The November 20 application was accompanied by a further affidavit of Agent Copus, setting forth additional information relating to the subjects of surveillance and the smuggling operation, including an intercepted conversation between Defendants Harvey, Balough and Campbell. Based on the application, affidavit and progress reports,

Judge Spellman entered an order on November 20, 1980, granting the request for extension, and authorizing interception of the same type of communications described in the October 20 order, i.e., relating to narcotics transactions, bribery, narcotics-related murders, identities of confederates, places of operation, and the full nature and scope of the conspiracy.

At approximately five (5) day intervals between November 20 and December 19, 1980, Judge Spellman received further progress reports describing the results of the electronic surveillance. On December 19, 1980, an application was submitted to Judge Spellman for a second extension of the October 20 order. The application sought continued authorization to intercept oral communications involving the same offenses as those enumerated in the October 17 application. The December 19 application was accompanied by a further affidavit of Agent Copus, setting forth additional information relating to the subjects of surveillance and the smuggling operation, including the contents of several conversations intercepted during the previous thirty (30) day period. Based on the application, affidavit and progress reports, Judge Spellman entered an order on December 19, 1980, granting the request for extension, and authorizing interception of the same type of communications described in the October 20 and November 20 orders, i.e., relating to narcotics transactions, bribery, narcotics-related murders, identities of confederates, places of operation, and the full nature and scope of the conspiracy. Judge

Spellman continued to receive five (5) day progress reports between December 19, 1980 and January 23, 1981. The electronic surveillance, which had commenced October 24, 1980, terminated on January 19, 1981.

The Government subsequently disclosed the contents of the intercepted conversations to a federal grand jury. On February 9, 1982, the grand jury returned an indictment charging Defendant Harvey in Count I with a violation of 21 U.S.C. § 848 (continuing criminal narcotics enterprise). Defendant Harvey was also charged with violations of other narcotics-related offenses, including 21 U.S.C. § 841(a)(1) and § 846. None of the applications, affidavits or orders mentioned above specifically cited 21 U.S.C. § 848. Defendant Harvey contends that pursuant to 18 U.S.C. § 2517(5) [2], the Government was required to apply for and obtain authorization and/or approval from a judge prior to disclosing the intercepted communications to the grand jury, and prior to using them at trial. The Government sought and obtained no such authorization or approval prior to disclosing the intercepted communications to the grand jury.

The Defendant's contention is based on *United States v. Brodson,* 528 F.2d 214 (7th Cir.1975) and *United States v. Marion,* 535 F.2d 697 (2d Cir.1976). In *Brodson* the Seventh Circuit, with Associate Justice Tom C. Clark sitting by designation, affirmed the dismissal of an indictment because the Government failed to get subsequent authorization for disclosure under § 2517(5). The defendant in *Brodson* was charged in the indictment with the transmission of wa-

---

**2.** 18 U.S.C. § 2517(5) provides:

(5) When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise

intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.

Subsection (3) of § 2517 provides:

(3) Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.

gers and wagering information in interstate commerce in violation of 18 U.S.C. § 1084. The evidence for the indictment was obtained through the interception of telephone conversations under an order that only authorized interceptions covering violations of 18 U.S.C. § 1955, which prohibits the operation of an illegal gambling business in interstate commerce. The Government filed an application under § 2517(5) just prior to trial and eight (8) months after the indictment was returned. The district court denied the application as untimely and dismissed the indictment. On appeal, the Seventh Circuit affirmed the dismissal, rejecting the Government's argument that no authorization was required under § 2517(5). The Government had argued that the evidence secured under the § 1955 order related to and applied equally to the § 1084 prosecution, thus no § 2517(5) authorization was necessary. The Seventh Circuit disagreed, finding that the two offenses were separate and distinct, involved dissimilar elements, and required different evidence, even though there might be some overlap because both concerned illegal gambling. *Brodson, supra,* 528 F.2d at 216.

In *Marion, supra,* the other case most heavily relied on by Defendant Harvey, the defendant had been indicted on one count of perjury (Count I) and two counts of obstruction of justice (Counts II and III). The indictment was the result of the defendant's evasive and inconsistent testimony before a federal grand jury. The defendant was questioned before the grand jury (after a grant of immunity) on the basis of two conversations intercepted and recorded pursuant to a state court order authorizing the interceptions. The so-called "lounge order" (authorizing electronic surveillance of a telephone at an establishment called "Jimmy's Lounge") authorized interception of communications related to various state offenses, including grand larceny by extortion, felonious assault, and conspiracy to commit those crimes. The so-called "Delmonico Order" (authorizing electronic surveillance of a telephone at the Delmonico Hotel) authorized interception of communications relating, *inter alia,* to the state

offense of possession of dangerous weapons. The federal grand jury in which the defendant testified was investigating possible federal offenses involving interference with interstate commerce by threats or violence, interstate travel and transportation in aid of racketeering, and transportation and transfer of an unregistered firearm through interstate commerce. The Government secured no formal or explicit approval or authorization order under § 2517(5) to use the evidence from the state electronic surveillance in the federal grand jury.

As to the evidence derived from the "Lounge Order", the Second Circuit held that when a state supreme court justice entered a renewal order subsequent to the original authorization order, approval under § 2517(5) was provided. The Court stated:

> As to the Lounge order and the Marion-Tortora conversation intercepted pursuant thereto, we conclude that § 2517(5) approval was provided in the renewal of that order by a Justice of State Supreme Court on March 8, 1972. We find that the affidavit of Assistant District Attorney Goldstock clearly provided the state judge—who had initially authorized the first Lounge wiretap one month before—with notification that possible federal offenses might be implicated. And we presume, as in *United States v. Tortorello,* [480 F.2d 764 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973) ], that in renewing the tap the judge carefully scrutinized those supporting papers and determined that the statute's requirements had been satisfied. [Footnotes omitted.]

*Marion, supra,* 535 F.2d at 703. Accordingly, the defendant's conviction for obstruction of justice in Count III was affirmed because the renewal granted by the state judge approved disclosure of evidence relating to the federal offenses. Because the requirement of § 2517(5) had been met by the renewal order, the Court found it unnecessary to determine "... whether the state crime of grand larceny by extortion and the federal offense of obstructing or delaying interstate commerce by threats or

violence could be considered sufficiently similar to obviate any need for § 2517 approval." *Id.* at 704 n. 13.

As to the "Delmonico Order", however, there was nothing in the record to indicate that any further applications for approval, renewal or extension were made. *Id.,* at 704 n. 14. The Court held that the federal offense of transportation and transfer of an unregistered firearm through interstate commerce is a separate and distinct offense from the state violation of illegal possession of dangerous weapons, and accordingly § 2517(5) authorization was required. *Id.,* at 704 & n. 13. Because no § 2517(5) authorization, either explicit or implicit, was obtained, the defendant's conviction for perjury (Count I) and the obstruction of justice charge in Count II were reversed.

The Court has carefully read and considered the *Brodson* and *Marion* cases, as well as other authorities on this issue cited by the Defendant, and the authorities cited by the Government. Based thereon, the Court concludes, (1) that no § 2517(5) authorization was necessary under the circumstances presented here because § 848 was not an offense "other than those specified in the order of authorization or approval" under the terms of § 2517(5) and (2) alternatively, the requirement of § 2517(5) was met because Judge Spellman gave implicit approval and authorization for the interception of communications relating to violations of § 848.

1. *Section 848 was not an offense "other than those specified in the order of authorization or approval" under § 2517(5).*

 There is no dispute that 21 U.S.C. § 848 was not specifically cited in the application for an order authorizing the interception, in the supporting affidavit of Agent Copus, or in the order authorizing the interception itself. As the Defendant argues

and the legislative history of § 2517 notes, § 2517 must be read in light of § 2518. S.Report No. 1097, 90th Cong., 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad. News 2112, 2188 (hereinafter S.Rep. No. 1097). Accordingly, an examination of the requirements of § 2518 is appropriate.

Section 2518(1)(b) requires that the application for an order authorizing the interception include, *inter alia:*

> (b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed . . . .

The legislative history of the Act sheds light on what degree of specificity and particularity was to be required, and the intended purpose of this requirement:

> Subparagraph (b) requires that a full and complete statement of the facts and circumstances relied upon by the applicant be set out, including (i) the details as to *what type of offense* has been, is being, or is about to be committed, . . . . Each of these requirements reflects the constitutional command of particularization (*Berger v. New York,* 87 S.Ct. 1873 [1883–1884], 388 U.S. 41, 58–60 [18 L.Ed.2d 1040] (1967); *Katz v. United States,* 88 S.Ct. 507 [512–514], 389 U.S. 347, 354–56 [19 L.Ed.2d 576] (1967)). (Emphasis supplied.)

S.Rep. No. 1097, *supra,* at 2189–90. In addition, § 2518(4)(c) requires that the order authorizing the interception set forth specifically:

> (c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates . . . .[3]

---

**3.** In requiring that the application contain "details as to the particular offense" committed, § 2518(1)(b), and that the authorization order contain "a statement of the particular offense to which it relates," § 2518(4)(c), the Act on its face does not explicitly require *statutory citations* to each and every possible offense allegedly committed. As noted *supra,* the legisla-

tive history characterizes § 2518(1)(b) as requiring that the application contain "the details as to *what type of offense* has been, is being, or is about to be committed. . . ." S.Rep. No. 1097, *supra,* at 2189–90. (Emphasis supplied.) Of course, citation of the appropriate statutory sections certainly enhances the particularity of the application and authorization order, and

The foregoing provisions were intended to incorporate into the Act the Fourth Amendment's requirement of particularity in authorization for a search, and to prohibit what Justice Clark referred to in *Brodson* as the "electronic equivalent . . . of a 'general search warrant.'" *Brodson, supra,* 528 F.2d at 215; *see U.S. v. Matya,* 541 F.2d 741, 746–47 (8th Cir.1976), *cert. denied,* 429 U.S. 1091, 97 S.Ct. 1101, 51 L.Ed.2d 536 (1977); *U.S. v. Armocida,* 515 F.2d 29, 37 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975); *U.S. v. Tortorello,* 480 F.2d 764, 779–81 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973).

The requirement of § 2517(5) was intended to prevent circumvention of the particularity and other safeguards of § 2518. When communications relating to offenses "other than those specified in the order of authorization or approval" are intercepted, § 2517(5) requires that a subsequent application be made to a judge for a determination as to the good faith of the original application prior to disclosure or use of the incidentally intercepted communications. The legislative history indicates the purpose and function of the subsequent application:

> Such subsequent application would include a showing that the original order was lawfully obtained, that it was sought in good faith and not as subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order.

S.Rep. No. 1097, *supra,* at 2189. Thus, the requirement of § 2517(5) was intended to prevent the applicant from setting forth certain crimes in the application, when in fact the applicant anticipated intercepting evidence of a different crime for which the prerequisites could not be satisfied. *See, e.g., United States v. Campagnuolo,* 556 F.2d 1209, 1213 (5th Cir.1977); *United States v. Marion, supra,* 535 F.2d at 700–01; *United States v. Vento,* 533 F.2d 838, 855 (8th Cir.1976).

The Fifth Circuit in *Campagnuolo* examined the meaning of the word "relating" in § 2517(5):

> In seeking to determine the proper application of section 2517(5), we are convinced that the phrase "relating to offenses other than those specified in the order of authorization" cannot be mechanistically understood. If the term "relating" as used in subsection (5) was construed to include even hypothetical relationships, the exception embodied in subsection (5) would inevitably swallow up subsection (3). Evidence of any federal crime will more than likely "relate" in some way to another federal offense. Evidence of a violation of federal gambling statutes, for example, is often evidence of income tax evasion. A myriad of other examples might be gleaned from the pages of the federal criminal statutes.
>
> We believe that the term "relating" must be understood in terms of the protection that subsection (5) was intended to afford. The legislative intent, at least, is apparent. Congress wished to assure that the Government does not secure a wiretap authorization order to investigate one offense as a subterfuge to acquire evidence of a different offense for which the prerequisites to an authorization or-

---

this practice is strongly encouraged and recommended.

The Court also notes § 2518(3)(a), which provides that the judge may enter the authorization order upon a determination that:

> (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter. . . .

In examining the enumerated offenses in § 2516, the Court notes that although most of the offenses are specifically named and cited, *the offenses relating to narcotics violations are broadly and generally described:*

(e) any offense involving fraud connected with a case under title 11 or the manufacture, importation, receiving, concealment, buying, selling or otherwise dealing in narcotic drugs, marihuana, or other dangerous drugs, punishable under any law of the United States;

. . .

18 U.S.C. § 2516(1)(e). Congress thus recognized the closely related nature of the various narcotics offenses. Reference to narcotics related offenses in an application should be examined in the context of this broad Congressional reference to such narcotics offenses.

der are lacking. In light of that objective, the term "relating" is best understood in terms of how the intercepted conversation is used by the Government and the Government's purpose in disclosing it.

556 F.2d at 1214–15.

The Court has carefully examined the affidavit of FBI Agent Harold Copus, and the application for the authorization order which incorporated the affidavit. The Court concludes that said affidavit sets forth probable cause as to each of the elements of an offense of 21 U.S.C. § 848. With regard to § 848, the application and incorporated affidavit set forth the "details as to the particular offense that has been, is being, or is about to be committed," because a violation of § 848 is described with particularity in the affidavit.[4] It is conceded that no statutory citation to § 848 is made. When an offense is described with particularity as it was here, however, that fact in no way frustrates the safeguards provided for in the Act. The fact that a § 848 violation was described with particularity in the affidavit incorporated in the application establishes that there was no subterfuge. There was probable cause to believe that a § 848 violation was occurring. The authorization order of October 20, 1980 stated that there was probable cause to believe that communications would be intercepted concerning:

> ... narcotics transactions, past and future bribery arrangements, information concerning four narcotic related murders, and conversation which will reveal the identities of confederates, the subject's

places of operation, and the full nature and scope of the conspiracy involved therein set forth in Agent Copus's affidavit attached as an exhibit to the within application.

Further, that order authorized the interception of communications that:

> ... reveal the full manner in which the above-mentioned subjects participated in the illegal conduct referred to in Agent Copus's Affidavits and which further reveal the identities of their confederates, their places of operation, and the nature and scope of the conspiracy involved therein....

These are the precise communications that were subsequently intercepted. The particularity with which the affidavit incorporated in the application described a violation of § 848 belies any notion that the Government sought approval to intercept as to some crimes as a subterfuge to intercept communications relating to a § 848 violation. The Government *had* probable cause as to a § 848 violation, and it was set forth in the affidavit. To suppress the product of the electronic surveillance or dismiss the indictment because the Government did not include a citation to 21 U.S.C. § 848 in the affidavit and/or application would constitute a triumph of form over substance. Because the affidavit incorporated in the application set forth with particularity an alleged violation of § 848 and established probable cause with regard thereto, § 848 was not an offense "other than those specified in the order of authorization or approval" within the meaning of § 2517(5), and the Government was not required to obtain

---

**4.** The elements of a § 848 offense are (1) violation of certain federal narcotics offenses (including 21 U.S.C. §§ 841(a)(1), 846), (2) said violation being part of a continuing series of such violations, (3) undertaken by the violator in concert with five or more other persons, (4) with respect to whom the violator occupies a position of organizer, a supervisory position, or any other position of management, and (5) from which the violator obtains substantial income or resources. *See United States v. Michel,* 588 F.2d 986, 1000 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32

(1979); *United States v. Johnson,* 575 F.2d 1347 (5th Cir.1978), *cert. denied,* 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed.2d 454 (1979); *United States v. Sperling,* 506 F.2d 1323, 1344 (2d Cir.1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). A reading of the affidavit of Agent Copus, incorporated in the application and referred to in the authorization order, reveals that probable cause is established as to each of these elements. The affidavit describes a violation of 21 U.S.C. § 848 in all but name.

subsequent authorization to disclose the product of the electronic surveillance.[5]

Other courts that have considered this issue have reached an identical conclusion based on similar reasoning. *See United States v. Daly,* 535 F.2d 434, 440 n. 6 (8th Cir.1976) (dicta); *United States v. Loften,* 518 F.Supp. 839, 843–44 (S.D.N.Y.1981); *cf. Campagnuolo, supra,* 556 F.2d at 1213–15.

2. *The requirement of § 2517(5) was met.*

 Where the authorizing judge is presented with applications to extend the surveillance, affidavits in support thereof, and/or progress reports of the interceptions obtained, and upon examination of these materials the judge grants authorization for an extension of the surveillance, this subsequent approval satisfies the requirement of § 2517(5) if the supplemental materials disclose to the judge that communications relating to offenses other than those specified in the original application, affidavit and order were intercepted. *United States v. Masciarelli,* 558 F.2d 1064, 1068–69 (2d Cir. 1977); *United States v. Marion, supra,* 535 F.2d at 703; *United States v. Tortorello, supra,* 480 F.2d at 781–83 (interpreting analogous provision of New York wiretap statute); *see United States v. Rizzo,* 492 F.2d 443, 447 (2d Cir.1974); *United States v. Loften, supra,* 518 F.Supp. at 844. This is so because the judge's approval, when presented with the fact that communications relating to other offenses have been intercepted, constitutes a determination that the original order was lawfully obtained, that it was sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order. *United States v. Masciarelli, supra,* 558 F.2d at 1068; *United States v. Tortorello, supra,* 480 F.2d at 782–83. Thus, as the Second Circuit stated in *Tortorello*:

> Neither the New York statute nor [§ 2517(5) ]requires the issuing judge to announce formally in open court that he

has noticed the interception of evidence not covered by the original order and has determined that it was properly obtained. It is enough that notification of the interception of evidence not authorized by the original order be clearly provided in the renewal and amendment application papers. A judge presumably will scrutinize any application and will scrupulously impose the restrictions required by statute.

480 F.2d at 783. The Second Circuit reiterated this view in *Masciarelli*:

> Thus, although a subsequent court authorization or approval issued after express delineation of offenses "other than those specified in the order" unquestionably satisfies § 2517(5), it does not represent the only method of compliance. We have adhered to the view that the disclosure in subsequent affidavits to the issuing judge of material facts constituting or clearly relating to other offenses satisfies the requirements of § 2517(5) under the *"Tortorello* rationale of implicit authorization" .... [Citations omitted.]

The facts in the case *sub judice* reveal that Judge Spellman, in granting authorization for two extensions after the initial thirty (30) day surveillance period expired, approved the interception of communications relating to a continuing criminal enterprise. Even beyond the initial affidavit and application, the progress reports of November 20, November 25, December 4 and December 11, 1980 (Title III suppression hearing, Defendant's Exhibit Nos. 19, 53A, 55A and 58A) revealed that communications had been intercepted relating to a large marijuana smuggling enterprise which, upon examination, constitutes a continuing criminal enterprise, as previously defined herein. *See* note 4, *supra.* On November 20 and December 19, 1980, applications were presented to Judge Spellman for extensions of the surveillance. These applications were accompanied by further affidavits of Agent Copus which set forth the content of the intercepted communications

---

5. The fact that in this case the affidavit incorporated in the application particularly described a violation of 21 U.S.C. § 848 and established probable cause relating thereto, distinguishes this case from the *Brodson* and *Marion* cases relied on by the Defendant.

revealing a large marijuana smuggling enterprise which, upon examination, constitutes a continuing criminal enterprise. On November 20 and December 19, 1980, Judge Spellman granted the requested extensions.

Accordingly, Judge Spellman's authorizations to extend the surveillance, given after notification that communications relating to a large marijuana smuggling enterprise had been intercepted, met the requirements of § 2517(5), as held in *Masciarelli, Marion,* and *Tortorello, supra.* The Government had not engaged in a subterfuge search. Thus, there is no basis for suppression or dismissal of the indictment for a § 2517(5) violation.[6]

## X. THE EFFECT OF MISSING PAGE 21C

During pretrial discovery proceedings, numerous documents relating to the electronic surveillance were provided to the Defendants by the Government. Included were two supporting affidavits of Agent Copus which accompanied and were incorporated in the two applications for *extension* orders presented to Judge Spellman. (*See* Copus Affidavit of November 20, 1980 (Title III Suppression Hearing, Defendant's Exhibit 13, Government's Exhibit 47); Copus Affidavit of December 19, 1980 (Title III Suppression Hearing, Defendant's Exhibit 24.) Both of those affidavits, at paragraph 7, refer to Agent Copus' *original* affidavit of October 17, 1980, and specifically page 21C, paragraph 74D thereof. However, an examination of the copies of Agent Copus' affidavit of October 17, 1980, provided to the Defendants, revealed that there was no page 21C included in said copies. In May, 1982, the Court ordered that the original affidavit, application and order relating to the electronic surveillance be unsealed for inspection. At said unsealing, the original *55* page Copus affidavit of October 17, 1980, (which had been under seal since October 22, 1980, by order of Judge Spellman)

contained no page 21C. Accordingly, page 21C was not included in the original Copus affidavit submitted to Judge Spellman. (See Judge Spellman's Affidavit, docket entry No. 886.)

Based on the absence of page 21C from the original Copus affidavit submitted to Judge Spellman, the Defendants contend that the communications were unlawfully intercepted, and under § 2518(10)(a)(i), their contents should be suppressed. In the Defendants' view, the failure to include page 21C in the affidavit submitted to Judge Spellman violated § 2518(1)(e) (disclosure of previous applications), § 2516 (approval of application by designated official), and § 2518(3)(c) (showing of necessity for electronic surveillance in application). Further, the Defendants claim that the missing page constitutes an intentional and material falsehood by the Government that warrants suppression and that the contents of the missing page, if included in the affidavit submitted to Judge Spellman, would have compelled the conclusion that no probable cause to conduct the electronic surveillance existed.

At a pretrial suppression hearing, the Court heard extensive testimony on this matter offered by the Defendants and the Government, and received voluminous documentary evidence. Having considered the evidence and the extensive argument of counsel the Court hereby makes findings of fact and conclusions of law, set forth fully below.

In early to mid-August, 1980, based on information gained during the course of the FBI investigation, Agent Copus completed a draft of an affidavit to be submitted in support of an application for authorization to conduct electronic surveillance at the office of Delray Towing. In July and again in September, 1980, Agent Copus caused a check to be made of the FBI Electronic Surveillance Indices to determine whether

6. The Government argues that even if a violation of § 2517(5) occurred, neither suppression nor dismissal of the indictment is an appropriate remedy. Because the Court has concluded that no violation of § 2517(5) occurred, it is not necessary to address this argument. For discussion of this argument in the context of alleged violations of § 2517(5) relating to the state interceptions, *see* Section XII. 6. at 66–67, *infra.*

there had been any prior applications for electronic surveillance of the same persons, facilities or places to be included in the application. Both of these checks revealed that there had been no such prior applications. Based thereon, Agent Copus included paragraph 6 in the affidavit, which states:

6. I caused a check to be made of the FBI Electronic Surveillance Indices to determine whether an application had been made for an electronic surveillance of any of the same persons, facilities, or places specified in the application accompanying this affidavit. The results of my inquiry were that there were no applications for electronic surveillance of the same persons, facilities, or places specified in the application accompanying this affidavit. The affiant has no knowledge of any other Federal or State agency that has had or has an electronic surveillance for this facility.

Prior to the time of drafting this affidavit, in July, 1980, Agent Copus and Agent Stephen Conger had met with officers of the Boca Raton, Florida, Police Department regarding an investigation by the Boca Raton officers of suspected drug smuggling activities of Robert Jernigan and others. At this meeting, the agents were told that the Boca Raton officers were monitoring a pen register, the subject of which was Robert Gainer Jernigan, although the pen register was not on Jernigan's phone. The agents found the Boca Raton officers generally uncooperative, and they did not learn of the scope of the Boca Raton investigation or the subjects of said investigation in this meeting. In fact, prior to the time the application for authorization for the interception was presented to Judge Spellman, there was little cooperation or communication between the Boca Raton investigators and the federal investigators. The federal agents deliberately refrained from learning the results of the Boca Raton investigation in order to avoid tainting their own investigation, should evidence from the Boca Raton investigation later be held unlawful. The agents were also concerned with allegations that local law enforcement officials had assisted Defendant Harvey in avoiding apprehension and arrest in the past. The agents believed there was a possibility that if they provided details of their investigation to local law enforcement officials, the information might be disclosed to Harvey. In fact, part of the FBI's investigation pertained to possible bribes of public officials by Harvey. Moreover, the federal agents believed that the Boca Raton investigators were incorrect in their belief that Robert Jernigan was the head of the smuggling operation; the federal agents believed that Harvey was in fact the head of the operation.

After Agent Copus completed the first draft of his affidavit, and as additional information was obtained, he would make addendums to the affidavit and insert these addendums at appropriate points. In October, 1980, Robert Jernigan, Jay Jernigan, and two other persons were arrested by Boca Raton police for violation of state narcotics laws. Newspaper articles revealed that there had been a wiretap as part of the investigation that led to those arrests. Thereupon, on October 14, 1980, Agent Copus called the Boca Raton Police Department to discuss the state wiretap with them. Agent Copus and Agent Conger met with Boca Raton officers that same day and learned that the state wiretap had been on the phone of Robert Jernigan.[7]

Prior to October 14, 1980, the federal agents had no knowledge of the wiretap conducted by the Boca Raton officers. They did not ascertain in this meeting whether Defendant Harvey was in fact intercepted on the state wiretap; it can be inferred that they knew that Harvey might

7. In the state criminal proceeding, *State of Florida v. Robert Gainer Jernigan, Jay Travis Jernigan, John Dennis Cason, Rudolph Lutz,* Case No. 80–5687–CF, Circuit Court of the Fifteenth Judicial Circuit, Palm Beach County, Florida, the Defendants' Motion to Suppress the communications intercepted by the state wiretap were denied. *See* Order of October 30, 1981, Exhibit "F" to Government's Response to Defendants' Motion to Suppress Wiretap Evidence (docket entry No. 700).

have been intercepted. Neither the agents nor any other federal official was aware of the contents of the state wiretap application during the time period of the federal interceptions, and they therefore did not know that Harvey was named in the state application. The federal investigators did not obtain copies of the state wiretap applications, orders, logs and some transcripts until *after* the federal electronic surveillance at Delray Towing had terminated, and these materials were kept in a separate file and not referred to until after the indictment was returned to avoid any possible taint of the federal investigation.

Also, on October 14, 1980, Agent Copus learned additional information from a source identified as a "concerned citizen." Based on the meeting with the Boca Raton officers and the additional information from the concerned citizen source, Agent Copus drafted page 21C as an addendum to the affidavit. Page 21C reads as follows:

### ADDENDUM

74.D On October 14, 1980, SA Harold C. Copus was advised by a concerned citizen that Billy Harvey was at the residence Gary Balough on October 10, 1980, when received a telephone call that he needed to go to his office at Delray Towing and get his records out of his office. Harvey was informed that Gainer Jernigan had been arrested and that an arrest warrant was outstanding for Dennis Cason. Harvey left Balough's house, went to his office where he retrieved some papers and then left town with his wife for an unscheduled vacation.

On October 14, 1980, the same concerned citizen advised that Jernigan had been arrested on state narcotics charges by the Boca Raton Police Department and that an arrest warrant was outstanding for Dennis Cason.

Ed Thornton, Boca Raton Police Department, was contacted on October 14, 1980, by SA Harold C. Copus. Thornton advised that his department had a state Title III on the telephone of Gainer Jernigan and had obtained evidence which led to a complaint and warrant for the arrest of Jernigan for violation of State narcotics charges. Thornton advised that Cason was not arrested and was a fugitive. The concerned citizen also advised on October 14, 1980, that Harvey had sent an airboat into the Everglades to locate Cason and then had Cason taken to a location where he could hide from law enforcement. Thornton also advised on October 14, 1980, that the bond for Jernigan was set at 2½ million dollars, but they expected the bond to be reduced and Jernigan would be released.

Your affiant believes that should Jernigan be released on bond, that he, Cason and Harvey will continue to meet in Harvey's office to discuss their criminal activities.

A copy of page 21C was sent by telefax to FBI headquarters and to the Department of Justice in Washington, D.C. to be considered for authorization to apply for an intercept order. The application, affidavit, etc., were already at the Department of Justice and had been for some weeks. An action memorandum from Philip Wilens, Director of the Office of Enforcement Operations, Criminal Division, to Assistant Attorney General Philip B. Heymann (Title III Suppression Hearing, Defendant's Exhibit 63) dated October 16, 1980, establishes that the Department of Justice received and considered the contents of page 21C. Assistant Attorney General Heymann gave authorization for the application on October 16, 1980 (Title III Suppression Hearing, Defendant's Exhibit 3, Government's Exhibit 40).

On or about October 14, 1980, and prior to October 17, 1980, when the application was submitted to Judge Spellman, Agent Copus and Agent Pedro Rubio met with Ann Vitunac, Chief of the Homocide and Organized Crime Units of the Palm Beach County State Attorney's Office, and Kenneth Selvig, an Assistant State Attorney for Palm Beach County. At this meeting Agents Copus and Rubio ascertained that the Boca Raton investigation was focused on Robert Jernigan, and that the state investigators

did not believe that their evidence at that time established probable cause to arrest Harvey. The FBI agents asked the investigators not to pursue investigation of Harvey. The FBI agents did not ask about nor did they receive information as to the contents of the state wiretaps, who had been the targets of that surveillance, and/or who was intercepted on the state wiretaps.

Agent Copus testified that page 21C was placed in the original affidavit submitted to Judge Spellman in support of the application for authorization to conduct the electronic surveillance at Delray Towing. Page 21C was not in the affidavit when the documents were unsealed in May, 1982. The page appeared in copies of the affidavits retained by the agents; it does not appear in copies of the affidavit retained by the U.S. Attorney's Office, from which the discovery materials were provided. There is no evidence that establishes how page 21C came to be missing from the affidavit. Based upon the evidence adduced, the Court finds and concludes that the omission of page 21C from the affidavit was an unintentional omission and not deliberate, it was not the result of a reckless disregard for the truth, and that there was no intent on the part of federal investigators to conceal the content of page 21C in any way from Judge Spellman. Page 21C was submitted in the copies of the affidavit attached to the subsequent affidavits filed to support applications for the extension orders, and thus was presented to Judge Spellman at that time. A progress report submitted to Judge Spellman dated November 4, 1980 (Government's Exhibit O), refers to "the arrests that were effected by the Boca Raton police several weeks ago, as reported previously to the Court." Page 21C had been submitted to and approved by Department of Justice officials in Washington prior to submission of the initial application to Judge Spellman. There was no intent to hide or conceal page 21C; rather, it was inadvertently omitted from the original affidavit submitted to Judge Spellman.

The Defendants assert that the omission of page 21C from the original Copus affidavit violated provisions of Title III and therefore should be suppressed. In addition, the Defendants contend that suppression is warranted because the omission constitutes deliberate falsehood or reckless disregard for the truth as to material facts, and because the contents of page 21C negated probable cause for the interception. These contentions are addressed *seriatim* below.

1. *Alleged violations of Title III.*

■ Defendants first contend that the omission of page 21C constituted a violation of § 2518(1)(e). That section requires that the application contain:

(e) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire or oral communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application. . . .

Based on the Copus affidavit, the application stated:

Agent Copus's Affidavit, which is attached hereto and incorporated by reference herein, reflects that a review of the Miami files of the Federal Bureau of Investigation, as well as the files of the FBI Headquarters fail to reflect any previous application for the individuals, phones, and location specified in this application.

Because page 21C contained information regarding the previous state wiretap of which Robert Jernigan was the target, the Defendants contend that the application did not contain "a full and complete statement of the facts concerning all previous applications . . . ," and suppression, they argue, is therefore mandated.

The Defendants rely primarily on *United States v. Bellosi*, 501 F.2d 833 (D.C.Cir. 1974). In that case, the Government *purposely* did not disclose in its applications the fact that one of the targets thereof had also been a target of an earlier application. The

D.C. Circuit affirmed the district court's order suppressing the communications intercepted. In the case *sub judice,* however, the omission was not intentional; rather, it was an inadvertent omission. The Fifth Circuit, in *United States v. Sklaroff,* 552 F.2d 1156, 1160 (5th Cir.1977), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978), distinguished *Bellosi* on this basis. Here, as in *Sklaroff,* "no inference that [the Government] was trying to hide any previous interceptions is justified." *Id.* at 1160.

Moreover, subsequent cases have more clearly defined the requirement of § 2518(1)(e). The application need not reveal a prior interception when the subject for which authorization is sought was not the target of the application seeking the prior interception. *United States v. Sklaroff, supra,* 552 F.2d at 1160; *United States v. Florea,* 541 F.2d 568, 575–76 (6th Cir. 1976), *cert. denied,* 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977); *United States v. Kilgore,* 518 F.2d 496, 500 (5th Cir.1975), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976). Further, the statute does not require a detailed statement describing the contents of the prior interception. *United States v. Kilgore, supra,* 518 F.2d at 500.

What § 2518(1)(e) requires is "a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application ... involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application." Concededly, the prior state application authorizing the wiretap on Robert Jernigan's phone should have been disclosed to Judge Spellman in the original application and incorporated affidavit as the Government intended but inadvertently failed to do. The issue is whether the Government's *inadvertent* failure to disclose the prior application to Judge Spellman in the original application warrants suppression. As the Supreme Court has held, not every failure to comply with any requirement of Title III renders the interception "unlawful." *United States v. Donovan,* 429 U.S. 413, 433, 97 S.Ct. 658, 671, 50

L.Ed.2d 652 (1977), citing *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) and *United States v. Chavez,* 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). In *United States v. Abramson,* 553 F.2d 1164, 1168–71 (8th Cir.), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977), the Government failed to state in the application that wiretap evidence obtained pursuant to a prior application which was disclosed was suppressed. The court held that the government had failed to comply with § 2518(1)(e). However, the court correctly looked to § 2518(10)(a), and the Supreme Court's construction of that section in *United States v. Donovan,* 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977), to determine whether suppression was mandated. As in *Donovan* and *Abramson,* the only basis for suppression under § 2518(10)(a) applicable to this case is subsection (i), which requires suppression where "the communication was unlawfully intercepted." As the court in *Abramson* noted:

> In *Donovan,* the Supreme Court repeated its earlier holding that suppression is required only for "a 'failure to satisfy any of those statutory requirements that directly and substantially implement the Congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.'" 97 S.Ct. at 671, *quoting United States v. Giordano,* 416 U.S. 505, 527, 94 S.Ct. 1820 [1832], 40 L.Ed.2d 341 (1974). It repeated also its earlier conclusion that a statutory violation renders an interception unlawful for purposes of § 2518(10)(a)(i) only if the requirement involved plays a "substantive role" in the regulatory system, 97 S.Ct. at 67, *citing United States v. Chavez,* 416 U.S. 562, 578, 94 S.Ct. 1849 [1857], 40 L.Ed.2d 380 (1974).

553 F.2d at 1170. In determining whether suppression was warranted, the Supreme Court considered whether the statutory violation vitiated the sufficiency of the factors which the issuing judge must find to be present if the interception is to be authoriz-

ed. *Donovan, supra,* 429 U.S. at 435–36, 97 S.Ct. at 671–672; *see Abramson, supra,* 553 F.2d at 1170. Those factors are:

> . . . that normal investigative techniques have failed or are unlikely to succeed and there is probable cause to believe that: (i) an individual is engaged in criminal activity, (ii) particular communications concerning the offense will be obtained through interception; (iii) the target facilities are being used in connection with specified criminal activity.

*Donovan, supra,* 429 U.S. at 435, 97 S.Ct. at 671; *Abramson, supra,* 553 F.2d at 1170. The Supreme Court in *Donovan* concluded that the particular violations involved in that case "could hardly invalidate an otherwise lawful judicial authorization." 429 U.S. at 435, 97 S.Ct. at 671. Likewise, in the context of failure to comply with § 2518(1)(e) by not disclosing suppression of wiretap evidence obtained pursuant to a previous application, the Eighth Circuit in *Abramson* concluded:

> Viewed against the backdrop supplied by the recent teachings of *United States v. Donovan, supra,* we hold that the failure to disclose the fact of suppression of the 1970 wiretap did not detract from the sufficiency of the enumerated factors necessary to a judge's wiretap authorization and hence was not central or functional in guarding against unwarranted use of wiretapping or electronic surveillance.

553 F.2d at 1170.

Under the particular facts and circumstances presented in this case, the Court concludes that the omission of page 21C containing reference to the prior state wiretap of Robert Jernigan's telephone did not detract from the sufficiency of the enumerated factors necessary for authorization of the interceptions. The fact of the prior

state wiretap did not vitiate the showing in paragraphs 131 through 144 of Copus' affidavit that normal investigative techniques had failed or were unlikely to succeed. In fact, this showing was strengthened by other information in page 21C. Although page 21C revealed that a prior state wiretap had been placed on Robert Jernigan's phone, it also revealed that Harvey had taken papers from his office and left on an unscheduled vacation, that Dennis Cason was a fugitive and Harvey had made arrangements for him to hide from law enforcement officials, and that Jernigan had been arrested. The targets would certainly now take even greater precautions to frustrate normal investigative techniques. The FBI agents knew from their meetings with state authorities that the state investigators did not have sufficient evidence to arrest Harvey. Thus, the showing of necessity for the electronic surveillance was not vitiated by the fact of the prior state wiretap.[8] Nor does the fact of the prior state wiretap vitiate the showings that communications relating to the offense would be intercepted or that the target facility would be used for communications relating to the specified offenses. If anything, the prior state wiretap strengthened the latter two factors, because the targets could be expected to use face-to-face meetings rather than telephone communications to conduct the unlawful enterprise.

Moreover, Judge Spellman was subsequently apprised of the prior state wiretap when the Copus affidavit with page 21C included was presented as part of the application for the two subsequent extensions. It is to be presumed that Judge Spellman "carefully scrutinized those supporting papers and determined that the statute's requirements had been satisfied." *United States v. Masciarelli, supra* 558 F.2d at 1068; *United States v. Marion, supra,* 535

---

**8.** The foregoing conclusion disposes of the contention that the contents of page 21C vitiate the showing of necessity under § 2518(3)(c). Although unrelated to the issues created by missing page 21C, Defendant Harvey argues in his Fifth Supplement at pp. 16–17 that the absence of reference in Copus' affidavit to evidence obtained in controlled trash collections as part

of the state investigation vitiated the showing of necessity under § 2518(3)(c) and rendered the affidavit materially false. This argument is without merit. Even with this evidence, the state investigators had told the FBI agents that the state lacked sufficient evidence to arrest Harvey.

F.2d at 703; *United States v. Tortorello, supra,* 480 F.2d at 783. Under the facts and circumstances presented in this case, the Government's inadvertent failure to include page 21 with the reference to the prior state wiretap in the original affidavit submitted to Judge Spellman did not vitiate the essential factors necessary for the authorization, as set forth above. Moreover, Judge Spellman was subsequently presented with the fact of the prior state wiretap and thereafter approved two extensions of the federal interceptions. Under these circumstances, the interceptions were not "unlawful", and suppression under § 2518(10)(a)(i) is not mandated.

Defendant Harvey argues that page 21C, even had it been presented to Judge Spellman, did not constitute a "full and complete statement of the facts concerning" the previous state wiretap as required by § 2518(1)(e), and that suppression is therefore required. Defendant Harvey contends that this is so because page 21C did not identify Harvey as a named party to the state wiretap application. However, the facts as set forth *supra,* establish that the federal investigators did not know that Harvey was named in the state wiretap application until sometime after the federal electronic surveillance had terminated. The Government cannot be required to disclose something its agents do not know. Acceptance of Defendant Harvey's arguments in this regard would in effect impose a duty upon the Government agents to conduct a full investigation to ascertain the details and particulars of all prior interceptions, a proposition neither the Act nor the case law supports. Section 2518(1)(e) requires only that the application contain a "full and complete statement of the facts concerning all previous applications *known to the individual"* making the application (emphasis supplied). That Robert Jernigan had been the subject of a prior state wiretap was all that the agents knew for certain. They also knew that Harvey might have been intercepted, an obvious inference that could be drawn from the nature of the conspiracy revealed by the Copus affidavit. Moreover, the agents did not know for a fact that

Harvey's communications had been intercepted on the state wiretap; the state investigators had not told them this, nor did they know of the contents of the state interception at the time they applied to Judge Spellman. The federal agents purposely avoided involvement in the state investigation, out of legitimate concerns regarding possible tainting or compromising of the federal investigation. Under all the facts and circumstances, the information included in page 21C constituted "a full and complete statement of the facts concerning" the prior state wiretap. *See United States v. O'Neill,* 497 F.2d 1020, 1025–26 (6th Cir.1974).

Defendant Harvey further contends that omission of page 21C from the original Copus affidavit submitted to Judge Spellman caused a violation of § 2516, because the application approved by Assistant Attorney General Heymann in Washington was a materially different application than that submitted to Judge Spellman. This argument is without merit. Section 2516 was intended to centralize in a publicly responsible official the formulation of law enforcement policy on the use of electronic surveillance techniques, and to interpose the judgment of a Justice Department official as a precondition to a judicial order. S.Rep. No. 1097, *supra,* at 2185; *United States v. Giordano,* 416 U.S. 505, 515–16, 94 S.Ct. 1820, 1826–1827, 40 L.Ed.2d 341 (1974). Had the investigatory personnel in this case sought judicial authorization without the approval of the appropriate Justice Department official, or had there been a concealment of material facts from the Department, a different result might be compelled. Here, however, the full and complete application was submitted to and approved by the Justice Department; the inadvertent omission of a page in the affidavit submitted to the judge does not constitute a violation of § 2516.

2. *The allegation of intentional omission and the effect of missing page 21C on the showing of probable cause.*

▮ The Defendants argue that the omission of page 21C from the affidavit

submitted to Judge Spellman constituted a deliberate falsehood or a reckless disregard for the truth as to material matters, and thus that suppression is compelled. The Defendants also argue that the contents of page 21C vitiate probable cause, and thus invalidate the authorization for the interceptions. For the reasons set forth below, the Court rejects these contentions.

■ The affidavit is invalid only if it is shown by a preponderance of the evidence (1) that it contains knowing and intentional material misrepresentations, or there has been a reckless disregard for the truth as to material matters, and (2) without the false material, the affidavit is insufficient to establish probable cause. *Franks v. Delaware,* 438 U.S. 154, 155–56, 171, 98 S.Ct. 2674, 2676–2677, 2684, 57 L.Ed.2d 667 (1978); *United States v. Lewis,* 621 F.2d 1382, 1389 (5th Cir.1980), *cert. denied,* 450 U.S. 935, 101 S.Ct. 1400, 67 L.Ed.2d 370 (1981); *United States v. Martin,* 599 F.2d 880, 886 (9th Cir.1979) (in context of Title III); *United States v. Astroff,* 578 F.2d 133 (5th Cir.1978) (*en banc*). Omissions are treated the same as misstatements. *United States v. Martin,* 615 F.2d 318, 327–28 (5th Cir.1980). *Martin* sets forth the test for determining whether suppression should occur where an omission is involved. For suppression to occur it must be shown by a preponderance of the evidence (1) that the omission was in fact made, (2) that it was made intentionally or with reckless disregard for the truth, and if these showings are made, (3) that if the omitted material had been included in the affidavit, the affidavit would be insufficient to establish probable cause. *Martin, supra,* 615 F.2d at 328.

The Defendants have failed to make a sufficient showing by a preponderance of the evidence as to two of the required elements. As discussed *supra,* the Court concludes from the evidence adduced at the suppression hearing that the omission of page 21C was not intentional and was not made with a reckless disregard for the truth. The Court finds that there was no bad faith, intent to deceive or conceal, or reckless disregard for the truth. Rather, the omission of the page was inadvertent and unintentional. The matters referred to in page 21C were subsequently revealed in progress reports to Judge Spellman. The page was included in copies of the affidavit submitted as part of the applications for extension, and it had been sent to Department of Justice officials in Washington. The record reveals no intent to conceal the contents of page 21C. The Defendants have failed to show by a preponderance of the evidence that there was an intentional omission or a reckless disregard for the truth.

The Defendants have also failed to show that had page 21C been included in the affidavit, probable cause would no longer have existed. Although page 21C stated that Harvey had left town on an unscheduled vacation and Jernigan was in jail, it also stated that state investigators expected Jernigan's bond to be reduced and that he would be released. The affidavit taken as a whole established the existence of a large, well-organized, ongoing conspiracy. The fact that Harvey had left town on an unscheduled vacation does not alone vitiate probable cause. Three employees of Delray Towing were named in the affidavit as possible co-conspirators, and they might well have had access to and use of the office in Harvey's absence. After the state arrests and the fact of the state wiretap became public knowledge, it became more likely that the targets would meet at Delray Towing to conduct business face to face. As discussed *supra,* the contents of page 21C did not lessen the showing of necessity at paragraphs 131–144 of the affidavit, since the targets would, after the state arrests, be even more cautious and make even greater attempts to frustrate normal law enforcement techniques. With or without page 21C, the Copus affidavit adequately stated probable cause.

Accordingly, because the Defendants failed to prove an intentional omission or reckless disregard for the truth, and because inclusion of page 21C in the affidavit would not have vitiated the probable cause

showing, omission of page 21C does not provide a basis for suppression on those grounds.

## XI. MINIMIZATION

■ The Court heard testimony and received documentary evidence relating to the requirement that the interceptions "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter...." 18 U.S.C. § 2518(5). Having heard, received and considered said evidence, and having heard extensive argument by counsel, the Court hereby makes findings of fact and conclusions of law, as set forth below.

The Copus affidavit stated at paragraph 147 with regard to minimization:

> Monitoring of oral communications in the office of Delray Towing Service, Inc., will immediately be suspended when it is determined through voice identification, surveillance, or the nature of the conversation that none of the principals are participants in the conversation, or, even if they are participants, the conversation is not criminal in nature. To further protect the privacy of those in the office of Delray Towing Service, Inc., no monitoring of the target premises will occur unless a vehicle known to be occupied or driven by one of the principals is observed in proximity to the premises. In addition, the Special Agents of the FBI will make good faith efforts to avoid intercepts of nonpertinent oral communications.

The order and extensions thereof authorizing interception contained the requirement that minimization occur as required by § 2518(5). Assistant U.S. Attorney Gillman prepared a detailed set of instructions (Title III Suppression Hearing, Defendant's Exhibit 77, Government's Exhibit 33) which set forth extensive directions to assure that minimization occurred. These instructions and a copy of the authorization order were kept at the listening post, and records kept there indicated the monitoring agents read them. Assistant U.S. Attorney Gillman met with the monitoring agents prior to commencement of the interception and explained the minimization procedures and requirements. This activity was reported to Judge Spellman (Title III Suppression Hearing, Defendant's Exhibit 32, Government's Exhibit 10). Judge Spellman received progress reports approximately every five (5) days, and close judicial supervision over the interceptions occurred. The progress reports, the logs of the interception, and the testimony at the suppression hearing reveal that conversations were in fact minimized.

The Government has the burden of establishing that the minimization requirement was met. *United States v. Rizzo,* 491 F.2d 215, 217 (2d Cir.1974), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974). Having considered all of the evidence adduced, the Court concludes that the Government has sustained its burden, and that the minimization requirement was met in this case.

■ Minimization requires an objective assessment of the agents' actions in light of the facts and circumstances of the particular case. *Scott v. United States,* 436 U.S. 128, 139–40, 98 S.Ct. 1717, 1724–1725, 56 L.Ed.2d 168 (1978). The standard is a test of reasonableness based on the facts and circumstances. *United States v. Hyde,* 574 F.2d 856, 869 (5th Cir.1978); *United States v. Daly,* 535 F.2d 434, 441 (8th Cir.1976). Three specific factors are considered in determining reasonableness: (1) the nature and scope of the criminal enterprise under investigation, (2) the Government's reasonable inference of the character of a conversation from the parties to it, and (3) the extent of judicial supervision. *United States v. Hyde, supra,* 535 F.2d at 441. Examination of these factors in the context of the facts presented in this case reveals that the Government complied fully with the minimization requirement. The evidence establishes that the monitoring agents showed a high regard for privacy rights and did all they reasonably could to avoid unnecessary intrusions. *See United States v. Feldman,* 606 F.2d 673, 679 (6th

Cir.1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1648, 64 L.Ed.2d 236 (1980); *United States v. Quintana,* 508 F.2d 867, 873–76 (7th Cir.1975); *United States v. James,* 494 F.2d 1007, 1018–23 (D.C.Cir.1974), *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). An examination of the surveillance logs supports the testimony by monitoring agents that they in fact did minimize the conversations overheard, notwithstanding the failure to use any specific word such as "minimization" as a designation in the surveillance logs where records of the communications intercepted were kept. There is nothing in the record of evidence adduced to suggest that the monitoring agents imprudently monitored in a manner contrary to the congressional intent of § 2518(5) or the plain language of that provision in any pattern or to such a degree that would support application of the drastic remedy of suppression.

The Defendants have raised several contentions which they contend show that the minimization requirement was not complied with: inadequate follow-up by Assistant U.S. Attorney Gillman to assure compliance with the instructions; failure to read and sign copies of instructions and the authorization order at the listening post; failure to familiarize monitoring agents with voices of the principals; failure to record all conversations monitored; falsification of progress reports; and inaccurate maintenance of the logs. All of these contentions are either totally unsupported by the evidence adduced at the suppression hearing or were unnecessary under the circumstances to accomplish minimization. The Defendants have particularly urged, based on paragraph 147 of the Copus affidavit, that failure of the agents to monitor only when surveillance of the premises revealed the presence of target individuals compels a finding that minimization did not occur. The affidavit must be considered as a whole, however, and paragraphs 134 and 135 indicate the difficulty in conducting physical surveillance of the premises. Based on all of the facts and circumstances, and based on the evidence adduced, the agents in good faith minimized their moni-

toring, and the standard of reasonableness was met. The contentions of the Defendants that the requirement of minimization was not met and that suppression is required are without merit.

## XII. FLORIDA STATE CHAPTER 934 INTERCEPT

Under date of August 5, 1980, the Honorable Tom Johnson, Circuit Judge of the 15th Judicial Circuit, Criminal Division, Palm Beach County, Florida, issued an order for a wiretap under Fla.Stat. § 934.07, to intercept communications relating to violations of Florida narcotics laws and marijuana smuggling. A 30-day extension was issued on September 3, 1980, and a second 30-day extension was issued on October 3, 1980. David J. Bludworth, State Attorney for the 15th Judicial Circuit of Florida, authorized the Chief of Police of Boca Raton Police Department, Boca Raton, Florida, based upon an affidavit of Detective William T. Sims, to apply to the court for the wiretap order. Included among the persons named in the orders were William Joseph Harvey, Robert Gainer Jernigan, Jay Jernigan and John Cason.

Defendants Harvey and Robert G. Jernigan, joined by other "aggrieved" co-defendants, addressed Motions to Suppress the Florida state wiretap evidence. At the extensive pretrial evidentiary hearings conducted on pending pretrial motions, the Court invited any and all parties to present testimony and/or evidence and oral argument for or against the suppression of the Florida state wiretap and the evidence derived therefrom. No party proffered or offered to produce any testimony or evidence attacking the Florida state wiretap and no party argued the merits orally. It was submitted on the memoranda of law and the record of the pretrial hearings, if any, applicable thereto. Therefore, no findings of fact are necessary or required and the matter was considered by the Court on the issues of law presented; except that the issue of disclosure of the Florida state wiretap evidence under 21 U.S.C. § 2517(3), (5) is discussed *infra.*

■ The validity of the state wiretap authorization is to be determined under state law. *United States v. Fury,* 554 F.2d 522, 525 (2d Cir.1977), *cert. denied,* 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978); *United States v. Manfredi,* 488 F.2d 588, 598 (2d Cir.1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974). However, the admissibility of the evidence at trial is governed by federal law. *United States v. Nelligan,* 573 F.2d 251, 253 (5th Cir.1978). Chapter 934, Fla.Stat., is in fact almost identical to Title III and if valid under state law the Florida wiretap would be valid and admissible in federal court under federal law. *See State v. Aurilio,* 366 So.2d 71, 74 (4th DCA 1978), *cert. denied,* 376 So.2d 76 (1979). Defendant Harvey concedes that (pg. 54 of Defendant Harvey's Motion/Memorandum in Support of Suppression) "It takes but a glance to see that the language of the Florida wiretap statute, as a whole and in the relevant section, was taken by the legislature wholesale from the language of Title III." The Court is in accord that fundamentally and basically Chapter 934 is almost identical to Title III.

### 1. *Probable Cause.*

■ It should be noted that the attack on probable cause made by the Defendants is not an attack on the affiant's veracity but rather is merely a facial attack on the affidavit. *See Franks v. Delaware, supra.* Defendants Jernigan and Harvey, among others, argue that there was insufficient probable cause in accordance with Fla.Stat. § 934.09(3) to issue the order. As in the federal statute, the state statute requires probable cause to believe that an individual is committing, has committed, or is about to commit one of the enumerated offenses; to believe that particular communications concerning that offense will be obtained through the wiretap; and to believe that the facilities from which the communication is to be intercepted are being used in connection with the commission of the suggested offenses. Defendants argue that Detective Sims' affidavit contains conclusory allegations, broad generalizations and speculation, that any of the allegations are unrelated to or insufficient as to Robert Jernigan and that the information in the affidavit is stale.

Contrary to the Defendants' assertions, the conclusions in the affidavit are supported by the underlying facts. Additionally, affiant Sims unquestionably qualifies as an expert in the area of drug investigation. His interpretations as to the significance of items of trash, memos or writings, as well as the connection between the telephone numbers revealed by pen registers, all lend credibility to the affidavit which should be read as a whole, not in isolation as to various bits and pieces. *Rodriguez v. State,* 297 So.2d 15, 17 (Fla.1974). Sims states the underlying circumstances from which most of his observations are made and couples with it his expertise as a drug expert in weighing the evidence.

Defendants likewise claim that the information supplied by the informants and Siciliani is insufficient. The Court finds that insofar as the affidavit is concerned the statements by informants meet both the credibility test and knowledge required under *Aguilar, supra* and *Spinelli, supra.* Siciliani's statement attached to the affidavit and the information furnished by him to the affiant was against his penal interest since it constituted an admission by him of his guilt following arrest. In *United States v. Squella-Avendano,* 447 F.2d 575, 583 (5th Cir.), *cert. denied,* 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971), the Fifth Circuit held that in the instance of a first-time informer wherein reliability may be problematic, the wealth of an informant's verified details can be considered in assessing his veracity and credibility. The judge issuing the wiretap therefore could consider that details supplied by Siciliani were corroborated and therefore an aid to establishing his credibility. *Spinelli v. United States,* 393 U.S. 410, 417–18, 89 S.Ct. 584, 589–590, 21 L.Ed.2d 637 (1969).

The Defendants next argue staleness. In fact, however, the affidavit details information commencing over two years prior to and up until mid-July 1980, for an application made on August 5, 1980. There are

trash pickups with incriminating information described in the affidavit as late as July 13, 1980, and the murder on July 23, 1980, of a member of the organization who had been arrested in a May 5th drug incident, is revealed in the affidavit. The facts in the affidavit clearly evidence an ongoing criminal enterprise. It adequately alleges facts showing probable cause that matters which had occurred in the past would still be occurring, or would re-occur in the near future. In *Rodriguez, supra,* the Supreme Court of Florida suggested a 30-day rule of thumb for staleness but also stated that the issue of staleness cannot be solved by a simple application of numbers of days without consideration of the overall particular circumstances presented by the case at hand. *Rodriguez, supra* at 18. The staleness issue should be viewed more liberally when a continuing pattern of criminal activity is alleged, since the basic criteria as to the duration of probable cause is the inherent nature of the crime. *Bastida v. Henderson,* 487 F.2d 860, 864 (5th Cir.1973). *See also Hudson v. State,* 368 So.2d 899, 901–02 (3d DCA), *cert. denied,* 378 So.2d 345 (1979) (longstanding, ongoing pattern of criminal activity not likely to cease mysteriously within the previous several weeks). The period from mid-July to August 5, 1980, did not render the probable cause stale. *State v. Manning,* 379 So.2d 1307 (4th DCA), *cert. denied,* 388 So.2d 1115 (1980); *United States v. Hyde,* 574 F.2d 856, 865 (5th Cir.1978).

**2. *Lack of Necessity.***

■ Defendant Jernigan contends that the application fails to adequately demonstrate the necessity for wiretapping as opposed to less invasive investigatory procedures as required by Fla.Stat. § 934.09(3). These restrictions are designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice. It is to be tested in a practical and common-sense fashion and does not require that all possible techniques be exhausted before a wiretap is authorized. *Hudson v. State, supra.* In *State v. Birs,* 394 So.2d 1054, 1057 (4th DCA 1981), the court noted that all that must be shown is

that other reasonable investigative procedures have been tried and are either too dangerous, have failed, or are likely to fail. If other techniques have not been tried, the reasons as to why they reasonably appear unlikely to succeed must be demonstrated.

Judged against the foregoing standard, the allegations of pages 21–23 of Detective Sims' affidavit demonstrate the statutory necessity to resort to the wiretap. Sims discusses surveillance, immunity, search warrants and the use of infiltrators. These are not mere boiler-plate conclusions of Sims, but are supported by specific details as to why those alternative methods were either unsuccessful in the past, would be unsuccessful in the future, or are too dangerous.

**3. *Improper Authorization.***

■ Jernigan contends that since this application was made by Detective Sims, with State Attorney Bludworth authorizing Sims to apply by means of an authorization letter, the application violated Fla.Stat. § 934.07, which provides that the Governor, Attorney General or any state attorney may authorize an application to a judge.

This very same contention was addressed in *State v. Birs,* 394 So.2d 1055, 1056 (4th DCA 1981), and in *State v. McGillicuddy,* 342 So.2d 567, 569–70 (2d DCA 1977), in which it was held that it is unnecessary for the state attorney to personally apply for the wiretap order as written authorization by a state attorney for another meets the statute's requirement that "any State Attorney may authorize...."

Thus, this contention is without merit.

**4. *First and Second Extension Orders Unlawful.***

Defendants argue that since the August 5 order was invalid, both of the extension orders were invalid as fruits of the poisonous tree. Since this Court has found that the original order was valid, this argument is therefore without merit as to the extensions.

Defendants contend that the application for the first and second extensions each

lack probable cause, and that the information developed during the respective intervals of time does not reveal significant incriminating evidence. Each extension application is supported by the original application, affidavit and order, as well as information gleaned during the intervals. Taking each extension application within its totality of circumstances, there was ample evidence to establish probable cause for each extension in this ongoing, continuing criminal enterprise.

5. *No Authorization in Florida Statutes to Wiretap for Marijuana Offenses.*

 Harvey argues that a comparison of 18 U.S.C. § 2516(2) and Fla.Stat. § 934.-07 shows that the Florida legislature decided to omit marijuana from the offenses for which a wiretap could be obtained; that since the federal statute says "or dealing in narcotic drugs, marihuana or other dangerous drugs" while the Florida statute says "or dealing in narcotics or other dangerous drugs", it is clear that the Florida legislature intended to omit marihuana from the offenses for which authorization to intercept may be given.

However, although not addressing this specific issue, nevertheless Florida courts have upheld wiretaps based solely on information pertaining to marijuana. *See State v. McManus,* 404 So.2d 757, 758 (4th DCA 1981) and *State v. Manning,* 379 So.2d 1307, 1308 (4th DCA), *cert. denied,* 388 So.2d 1115 (1980). Also, Florida courts have recognized marijuana as a narcotic and dangerous drug. *Buttler v. State,* 238 So.2d 313, 314 (3d DCA 1970); *Williams v. State,* 293 So.2d 772 (3d DCA), *cert. denied,* 301 So.2d 778 (1974); *Borras v. State,* 229 So.2d 244 (Fla.1969), *cert. denied,* 400 U.S. 808, 91 S.Ct. 70, 27 L.Ed.2d 37 (1970). Moreover, the Florida Supreme Court in *Hamilton v. State,* 366 So.2d 8, 10 (Fla.1978) held that the legislature has discretion to include marijuana as a narcotic and along with other dangerous drugs. Thus, there was no need to include marijuana separately since the law in Florida is clearly that marijuana is a narcotic or other dangerous drug. Accordingly, the wiretap was conducted in connection with authorized offenses under Chapter 934.

6. *Whether § 2517(5) was Violated Regarding the State Wiretap.*

 Defendant Harvey contends that an application and authorization order for disclosure of the product of the state wiretap, said order obtained from a state judge on August 9, 1982, were inadequate under § 2517(5), and therefore the product of the state wiretap should be excluded from use at the trial. The Defendant also argues that the testimony of a witness presented to the federal grand jury was evidence derived from the state wiretap, and since no authorization order for disclosure was obtained pursuant to § 2517(5) prior to the witness' testimony, the Defendant contends that the indictment should be dismissed. For the reasons set forth below, the Court concludes that the Defendant's arguments are without merit. A review of the pertinent facts follows.

Upon an extensive and detailed affidavit/application, state Circuit Court Judge Tom Johnson entered an order on August 5, 1980, authorizing law enforcement officers of the Boca Raton, Florida Police Department to intercept wire communications of Defendant Robert Jernigan and other named individuals, including Defendant Harvey, on two specified telephone numbers. The application was made and authorization was granted pursuant to Fla.Stat. § 934.01, *et seq.,* the Florida State analogue to Title III. The affidavit/application set forth probable cause to believe that communications would be intercepted relating to the state offense of possession, importation and distribution of marijuana of an organized nature or carried on as a conspiracy. The affidavit/application set forth information describing a large scale marijuana smuggling operation.

On September 3, 1980, based on a further affidavit/application which set forth additional information and the contents of intercepted communications, state Circuit Court Judge Carl Harper granted a 30-day extension of the interceptions. On October 3, 1980, based on a further affidavit/appli-

cation which set forth additional information and the contents of additional intercepted communications, Judge Johnson granted an additional 30-day extension of the interceptions. The interceptions pursuant to the original authorization and extensions occurred between August 5 and October 10, 1980.

Boca Raton police ascertained from the state-authorized interceptions that an attempt would be made to bring a quantity of marijuana into the United States by boat at a boat ramp at Lantana, Florida. The state officers notified U.S. Customs Officers, who intercepted the boat at the Lantana boat ramp on October 2, 1980, and arrested Darryl Falls and James Snow.

During the evidentiary hearings held herein and in a written memorandum of law in response to the Defendant's attack on the state wiretap evidence, the Government proffered that Darryl Falls was charged with violations of state narcotics laws. The Government further proffers that on July 30, 1981, Falls entered a plea agreement on the state charges, and agreed to cooperate with state and federal officials in return for a lesser charge and sentence. On January 25, 1982, Falls was subpoenaed to testify before the federal grand jury that later returned the indictment in this case. The grand jury returned the indictment on February 9, 1982.

Pursuant to a Discovery Order entered by the United States Magistrate on March 18, 1982, the Government provided the defense with materials relating to the state wiretap. At a Status Conference held in open court on April 1, 1982, the Government announced its intention to use the intercepted communications from the state wiretap at the trial. On August 9, 1982, State Circuit Court Judge Tom Johnson granted, on the Government's application, an order authorizing use of the contents of the communications intercepted in the state wiretap in the trial of this case.

Defendant Harvey argues that the order authorizing use of the state wiretap evidence is insufficient, because the application submitted to Judge Johnson by the Government did not meet the requirements of § 2518(1).[9] This argument presupposes that the requirements of § 2518(1) apply to an application made under § 2517(5). The Defendant has cited no case authority to support this proposition. The Fifth Circuit has specifically held that such an application need not be made upon oath or affirmation, which is one of the requirements of § 2518(1). *In re Grand Jury Proceedings,* 554 F.2d 712, 714 (5th Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 269, 54 L.Ed.2d 178 (1977). This view is supported by the fact that § 2517(5) on its face does not incorporate or refer to § 2518(1), and § 2517(5) itself imposes none of the requirements enumerated in § 2518(1) on the application for authorization to disclose.

The Defendants have also argued that the authorization of the Attorney General is required pursuant to § 2516 when authorization for disclosure is sought under § 2517(5). Again, the Defendant cites no case authority for this proposition, and § 2517(5) does not on its face so require. Section 2516 requires the authorization of the Attorney General only for an application for "an order authorizing or approving the interception of wire or oral communications," not for subsequent disclosure. Nor does the legislative history of the Act inti-

**9.** Both parties agree that the requirements of the federal Act apply to determine whether authorization for disclosure of the contents of the state wiretap was necessary and sufficient. There has been some disagreement on this point in the reported decisions. *Compare United States v. Tortorello, supra,* 480 F.2d at 782 (holding the New York state wiretap statute controlling on this issue) *with United States v. Marion, supra,* 535 F.2d at 701–03 (holding that the requirements of Title III apply and must be satisfied). This Court adopts the view espoused in *Marion* and advocated by the parties here as the correct one. Where the contents of state electronic surveillance is sought to be used in a federal proceeding, the requirements of Title III as to use and disclosure are applicable. *Marion, supra,* 535 F.2d at 702; *see United States v. Nelligan,* 573 F.2d 251, 253 (5th Cir.1978). In the case *sub judice,* the provisions of the Florida state wiretap act and Title III relating to authorization for disclosure are nearly identical. *Compare* 18 U.S.C. § 2517(5) *with* Fla.Stat. § 934.08(5).

mate an intent to impose the requirements of § 2516 or § 2518(1) on a § 2517(5) application for authorization to disclose.[10]

Defendant Harvey further contends that the authorization for disclosure granted by Judge Johnson is insufficient because it was not premised on a showing in the application for the disclosure order that the requirement of minimization was met in the state interceptions. This contention should be examined in the context of the purpose of § 2517(5). As discussed, *supra, § 2517(5)* was designed to prevent subterfuge searches in which the applicant would describe certain crimes in the original application, when in fact the applicant anticipated intercepting evidence of a different crime for which the prerequisites could not be satisfied. The legislative history indicates the subsequent application would include a showing that the original order was lawfully obtained, that it was sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order. S.Rep. No. 1097, *supra,* at 2189. The application to Judge Johnson and his subsequent order of August 9, 1982, satisfy this requirement and fulfill the purpose of § 2517(5). Judge Johnson had granted the original authorization and the last extension order, and was thus familiar with the particular interceptions involved. In the extensive evidentiary hearings before this Court, there was no evidence adduced to suggest collusion between the federal and state investigators to undertake a subterfuge search. The authorization for disclosure executed by Judge Johnson satisfies the requirements of § 2517(5).

The Defendant contends that the disclosure authorization was untimely under the requirement of § 2517(5) that the application for such authorization be made "as soon as practicable." The Government was ordered to provide materials relating to the state wiretap to the Defendants in March, 1982.[11] The Government disclosed in a status conference on April 1, 1982, that it would seek to use the contents of the state wiretap at trial. The authorization for disclosure was obtained on August 9, 1982. The "as soon as practicable" requirement should be read in a common-sense fashion. *United States v. Marion, supra,* 535 F.2d at 707; *United States v. Aloi,* 449 F.Supp. 698, 715–16 (E.D.N.Y.1977). The Court concludes that under the facts presented here, the "as soon as practicable" requirement of § 2517(5) was met. *See United States v. Vento,* 533 F.2d 838, 855 (3d Cir.1976); *United States v. Pine,* 473 F.Supp. 349, 352 (D.Md.1978); *United States v. Aloi,* 449 F.Supp. 698, 715–16 (E.D.N.Y.1977); *United States v. Denisio,* 360 F.Supp. 715, 720 (D.Md.1973); *cf. United States v. Campagnuolo,* 556 F.2d 1209 (5th Cir.1977) (no violation of § 2517(5) where disclosure order obtained prior to disclosure). The authorization order pursuant to § 2517(5) was obtained prior to any prohibited use of the contents of the state wiretaps; the Defendants have suffered no prejudice.

The Defendant contends that the testimony of Darryl Falls was evidence derived from the state wiretap, and therefore an authorization for disclosure under

---

**10.** The Defendant has noted that the Department of Justice Manual (Defendant's Exhibit No. 64, p. 45) states that it is the policy of the Attorney General that his authorization be obtained prior to application to a *federal court* for a disclosure order under § 2517(5). The manual does not provide for such authorization prior to application to a state court for disclosure of the contents of state electronic surveillance. Moreover, as the Defendant concedes, the provisions of the manual are not binding on the Government; Title III is the standard which governs. *See United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).

**11.** Testimony at the evidentiary hearing established that although the contents of the state wiretap were unsealed in December, 1980, the federal investigators purposely refrained from learning the contents of the state wiretap until March, 1982, after the federal indictment was returned. The federal investigators sought to avoid any possibility of tainting the federal investigation if the state wiretap was subsequently found to be unlawful. Thus, although the state wiretap terminated in October, 1980, the Government did not learn of its contents until March, 1982. The "as soon as practicable" requirement should be viewed in this context.

§ 2517(5) was required prior to Falls' testimony to the federal grand jury. Failure to secure such authorization prior to Falls' testimony in the Defendant's view requires dismissal of the indictment. The Court concludes that an authorization for disclosure was not required prior to Falls' appearance before the grand jury. The Court has examined, *in camera,* all transcripts of grand jury testimony by or from Darryl Falls, and other transcripts in which Falls' name is mentioned by another witness before the grand jury. In said transcripts there is no mention of or reference to the state investigation or electronic surveillance, nor is there reference to Falls' cooperation with state and/or federal officials in their investigations. No contents of the state wiretaps were disclosed to the grand jury.

Moreover, Falls' testimony was attenuated from the state interceptions such that the testimony was not evidence derived from the state wiretap within the meaning of § 2517(5). Falls' testimony was the result of a plea agreement on state charges and his decision to cooperate with state and federal officials in their respective investigations. The fact that Falls' apprehension resulted from information supplied by the state interceptions does not mean that his testimony is "evidence derived" from the state interceptions within the meaning of § 2517(5). *See United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *United States v. Hooton,* 662 F.2d 628, 631–33 (9th Cir.1981), *cert. denied,* 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982); *Passman v. Blackburn,* 652 F.2d 559, 565 (5th Cir.1981), *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1722, 72 L.Ed.2d 141 (1982); *United States v. Houltin,* 566 F.2d 1027 (5th Cir.), *cert. denied,* 439 U.S. 826, 99 S.Ct. 97, 58 L.Ed.2d 118 (1978); *Smith v. United States,* 324 F.2d 879, 881–82 (D.C.Cir.1963), *cert. denied,* 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964).

Even if a violation of § 2517(5) occurred, the Act does not necessarily mandate suppression or dismissal of the indictment. Untimely or improper disclosure is not an enumerated basis for suppression under § 2518(10)(a), nor does § 2515 of the Act

necessarily require dismissal of the indictment. *United States v. Rabstein,* 554 F.2d 190, 194, n. 6 (5th Cir.1977) (dicta); *United States v. Vento, supra,* 533 F.2d at 855; *United States v. Pine, supra,* 473 F.Supp. at 352; *United States v. Aloi, supra,* 449 F.Supp. at 718–23; *United States v. Denisio, supra,* 360 F.Supp. at 720; *see United States v. Donovan,* 429 U.S. 413, 432–34, 97 S.Ct. 658, 670–671, 50 L.Ed.2d 652 (1977); *United States v. Chavez,* 416 U.S. 562, 578, 94 S.Ct. 1849, 1857, 40 L.Ed.2d 380 (1974); *United States v. Giordano,* 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974).

The legislative history of the Act supports this conclusion. It provides that § 2515 and § 2517 must be read in light of § 2518(10)(a). S.Rep. No. 1097, *supra,* at 2184–85, 2188. With regard to § 2518(10)(a), the legislative history provides:

> This provision must be read in connection with sections 2515 and 2517, discussed above, which it limits. It provides the remedy for the right created by section 2515. Because no person is a party as such to a grand jury proceeding, the provision does not envision the making of a motion to suppress in the context of such a proceeding itself. *Normally, there is no limitation on the character of evidence that may be presented to a grand jury, which is enforcible by an individual.* (*Blue v. United States,* 86 S.Ct. 1416, 384 U.S. 251 [16 L.Ed.2d 510] (1965).) *There is no intent to change this general rule.* It is the intent of the provision only that when a motion to suppress is granted in another context its scope may include use in a future grand jury proceeding.

S.Rep. No. 1097, *supra,* at 2195 (emphasis supplied); *United States v. Aloi, supra,* at 720–21. The Court is mindful of the need to strictly scrutinize Government conduct to assure compliance with Title III. Under the facts and circumstances presented here, however, even if a violation of § 2517(5) had occurred, a proposition which the Court rejects, the drastic sanctions of suppression of the contents of the state wiretaps or

dismissal of the indictment would not be warranted.

By reason of the aforegoing, it is

ORDERED AND ADJUDGED that each and every Motion to Suppress the Title III oral intercept, evidence derived therefrom, and the Florida state Chapter 934 wiretap, and evidence derived therefrom, submitted by and on behalf of each Defendant who is an "aggrieved person", is hereby DENIED.

## ON MOTION TO VACATE RESTRAINING ORDER

This matter comes before the Court upon Defendant Harvey's Motion to Vacate Restraining Order and Alternative Motion for Adversary Hearing (docket No. 668). The Motion requests vacation of a February 10, 1982 restraining order which, by its terms, prevents the Defendant from selling, transferring, assigning, or otherwise disposing of any part of his beneficial interest in thirteen (13) listed and described assets during the pendency of the criminal proceedings against him. The thirteen assets comprise boats, real property, a Bell Jet Ranger helicopter, racing cars, trucks and luxury cars. The listed assets were allegedly purchased with profits accruing from the Defendant's alleged drug importation and distribution enterprise, in violation of the Continuing Criminal Enterprise (CCE) statute, 21 U.S.C. § 848 (1976). Such profits and assets, upon a defendant's conviction, are subject to forfeiture under the Act. 21 U.S.C. § 848(a).

Defendant Harvey and eighteen co-defendants were indicted on February 9, 1982, in a twenty-three count indictment charging Harvey with violations of Title 21, U.S.C. §§ 848, 963, 952(a), 846 and 841(a)(1), all of which are violations of the Drug Abuse and Control Act of 1970. Due to a ruptured disc in his spine and a concomitant need for surgery to correct this condition before he could undergo a lengthy trial, Defendant Harvey and one co-defendant were severed from the trial of their co-defendants, which commenced on September 8, 1982, and proceeded for eleven weeks, ending on November 27, 1982. Defendant Harvey's trial is presently scheduled to commence in the summer of 1983.

In view of the Defendant's instant motion and in consideration of the length of time which, by virtue of Defendant's surgery, must pass between the time the indictment was handed down and the time the Defendant will stand trial, the Court ordered an evidentiary hearing on the Motion to Vacate Restraining Order. On August 26th and 30th, 1982, the Court heard two days of testimony from four witnesses, received numerous exhibits into evidence, listened to sixteen (16) tape-recorded intercepted conversations of the Defendant concerning his activities, and entertained the argument of counsel. Based upon all the evidence adduced at the evidentiary hearing, the submissions of counsel, consideration of the applicable law, and having been otherwise fully advised in the premises, the Court hereby enters its Memorandum Opinion and Order which shall constitute its Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

On February 10, 1982, upon a sworn affidavit submitted by the United States Attorney describing Defendant Harvey's thirteen assets, asserting that they were purchased with drug profits, and alleging that the Defendant intended to dispose of them to avoid their forfeiture, the Honorable James W. Kehoe, United States District Judge, entered an Order restraining the Defendant, pending final disposition of the criminal charges against him, from directly or indirectly selling, assigning, pledging, distributing, or otherwise disposing of any part of his beneficial interest, direct or indirect, in the thirteen assets.

The authority of the District Court to issue an *ex parte* temporary restraining order of this type is derived from the Continuing Criminal Enterprise statute which provides, in pertinent part:

The district courts of the United States ... shall have jurisdiction to enter such restraining orders or prohibitions, or to take such other actions, including the acceptance of satisfactory performance bonds, in connection with any property or

other interest subject to forfeiture under this section, as they shall deem proper. 21 U.S.C. § 848(d).

This section is essentially identical to a Racketeer Influence and Corrupt Organizations Act ("RICO") provision, 18 U.S.C. § 1963(b), whose legislative history describes its purpose as "to prevent the preconviction transfers of property to defeat the purpose of the [forfeiture penalty]" provided by Congress. S.Rep. 91–167, 91st Cong., 1st Sess. 160 (1969).

Little guidance, however, in the application of such restraining orders is found in the statutory history, and few reported cases address the use of CCE forfeiture provisions. No cases from either the Fifth or the Eleventh Circuit deal with the issues presented by Defendant's motion. Nevertheless, it is useful to consider the actions and holding of those few courts which have encountered similar problems in construing the CCE and RICO statutes.

After discussing the law established in Earlier Cases, the Court will then address evidentiary considerations attendant upon a hearing of this type. Finally, the Court will apply the standard of proof articulated in *United States v. Long,* 654 F.2d 911 (3d Cir.1981), to the merits of the restraining order.

### Earlier Cases

In *United States v. Spilotro,* 680 F.2d 612 (9th Cir.1982), the defendant took an interlocutory appeal upon the district court's order setting a $180,000 performance bond before allowing the defendant to continue operation of his business, allegedly used in violation of RICO. The district court's order restrained the defendant from disposing of any title to, assets of, or interest in the business, but allowed its lawful and ordinary operation upon the posting of bond. The order on posting of the bond was entered after a hearing at which no evidence was received and pursuant to which no findings of fact or conclusions of law were set forth. *Id.* at 614–15. The Ninth Circuit held that under such a deprivation, "[b]ecause a RICO defendant's business

may well constitute the source of a substantial portion of his livelihood, and because a restraining order such as the present one has the effect of halting business activity," a prompt hearing after entry of the initial *ex parte* restraining order was required. *Id.* The Court further held that although due process protections applied, *id.,* it was *not* necessary for the hearing to "duplicate the pending criminal trial." *Id.* at 618. The case was remanded to the district court for a full evidentiary hearing.

Much of *Spilotro's* reasoning was predicated upon the holding of *United States v. Crozier,* 674 F.2d 1293 (9th Cir.1982). In *Crozier,* an interlocutory appeal was granted after the district court, pursuant to 21 U.S.C. § 848(d), entered an order restraining two defendants from selling or transferring jointly owned real property or from selling or transferring large amounts of jewelry and other personal property in which one or both had an interest. *Id.* at 1296. The order was issued without any hearing, before or after the order, and in spite of the fact that the second defendant was not charged with violating section 848. *Id.*

The court noted the irreparable harm that threatened the defendants, particularly the one not charged with a section 848 violation, and held that despite the exigent circumstances which may permit an *ex parte* restraining order, *see Boddie v. Connecticut,* 401 U.S. 371, 378–79, 91 S.Ct. 780, 786–787, 28 L.Ed.2d 113 (1970), the government may not wait until trial to produce adequate grounds for the forfeiture. *Id.* at 1297. The court in these circumstances mandated the application of civil standards for a temporary restraining order, *see* F.R. Civ.P. 65, and set forth what determinations the district court must make in such a hearing. *Id.* at 1297–98. The case was remanded for a hearing.

*United States v. Long,* 654 F.2d 911 (3d Cir.1981), addresses several of the issues that arise from the CCE forfeiture provisions. In *Long,* the CCE defendant transferred title to an airplane, stated to have been worth $140,000, to his attorneys before

an indictment was handed down against him. The transfer took place, however, when he was aware of the pending indictment and in exchange for past and future legal services in connection with the pending criminal charges. Pursuant to the CCE criminal forfeiture provisions, the government sought, and obtained, an *ex parte* restraining order against the airplane's sale, by either Long or his attorneys, and a $400,-000 interim bond to secure performance of the order.

The *Long* district court held a full hearing before entering a restraining order under 21 U.S.C. § 848(d), applying the following probable cause standard of proof: "[T]he government must demonstrate that it is likely to convince a jury, beyond a reasonable doubt, of two things: one, that the defendant is guilty of violating the Continuing Criminal Enterprise statute and two, that the profits or properties at issue are subject to forfeiture under the provisions of section 848(a)(2)." *Long,* 654 F.2d at 915. At the hearing, the district court found that both tests were satisfied and held that the continued effectiveness of the restraining order and performance bond was warranted. *Id.*

On appeal, Long's attorneys contended that criminal forfeiture can apply only to profits or properties owned by the defendant at the time the restraining order was issued. The *Long* court rejected the argument, despite its attempt to apply the distinction between *in rem* and *in personam* forfeiture, *see id.* at 916; *United States v. Veon,* 538 F.Supp. 237, 241–42 (E.D.Cal. 1982), on the ground that under these circumstances the transfer was a ruse intended to thwart the criminal forfeiture penalty intended by Congress. *Long,* 654 F.2d at 916.

A recent case from the Eastern District of California, in a learned opinion by Judge Lawrence K. Karlton, sets forth a judicial roadmap through the CCE and RICO forfeiture provisions. *United States v. Veon,* 538 F.Supp. 237 (E.D.Cal.1982); *see also United States v. Veon (Veon II),* 549 F.Supp. 274 (E.D.Cal.1982). Judge Karlton held that

the district court may enter an *ex parte* restraining order of brief duration, *id.* at 245, followed by an adversary hearing in which the burden of proof falls on the government. *Id.* The hearing must apply the *Long* standard of what the government must prove, *id.* at 246, and the degree of proof to the court requires application of the "preponderance of the evidence" standard. *Id.* at 247–48. Further, the Federal Rules of Evidence must be applied to the full hearing. *Id.* at 249.

The *Veon* court entered an *ex parte* order restraining the defendant's transfer of property. However, at the hearing that followed, "[t]he government declined to put on any admissible evidence that would support the continuing restraint of the property and the court dissolved the temporary restraining order." *Veon II,* 549 F.Supp. at 275.

For other discussions of CCE and/or RICO requirements, *see, generally, United States v. Mannino,* 635 F.2d 110 (2d Cir. 1980); *United States v. L'Hoste,* 609 F.2d 796 (5th Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980); *United States v. Thevis,* 474 F.Supp. 134 (N.D.Ga. 1979); *United States v. Bello,* 470 F.Supp. 723 (S.D.Cal.1979); *United States v. Meyers,* 432 F.Supp. 456 (W.D.Penn.1977); *United States v. Mandel,* 408 F.Supp. 679 (D.Md.1976), *aff'd in part and vacated on other grounds,* 591 F.2d 1347 (4th Cir.), *aff'd en banc,* 602 F.2d 653 (1979); *United States v. Scalzitti,* 408 F.Supp. 1014 (W.D. Pa.1975).

### Evidentiary Hearing Considerations

■ Prior to the August 26, 1982 hearing on Defendant Harvey's motion, the government gave the Court notice of its intention to use certain hearsay testimony in adducing evidence at the hearing. Upon due consideration and after receiving the government's representation that such testimony would be strictly limited, the Court held that hearsay testimony would be admissible in this type of preliminary proceeding for the purpose of meeting the *Long* standard of proof, discussed above. 654

F.2d at 915. In the Court's view, this holding is supported as a matter of law and as a matter of sound judicial policy, although there are holdings to the contrary. *Cf. United States v. Spilotro,* 680 F.2d 612, 619 n. 4 (9th Cir.1982); *United States v. Veon,* 538 F.Supp. 237, 249, 249 n. 20 (E.D.Cal. 1982).

▆ Though section 848 makes no provision for a hearing on an *ex parte* restraining order and the Federal Rules of Criminal Procedure similarly make no provision, it is nevertheless a well-recognized requirement of Fifth Amendment due process that some kind of hearing be afforded when there is a "taking" or "deprivation" of property. *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 606, 95 S.Ct. 719, 722, 42 L.Ed.2d 751 (1975); *Fuentes v. Shevin,* 407 U.S. 67, 79, 92 S.Ct. 1983, 1993, 32 L.Ed.2d 556 (1972); *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1968).

Under the instant facts, it may well be the case that the effect of the *ex parte* order · restraining the sale or transfer of defendant's property, but permitting every other kind of use, does not rise to the level of a "taking" or "deprivation" sufficient to trigger due process protections. In *United States v. Scalzitti,* 408 F.Supp. 1014, 1015 (W.D.Pa.1975), the court considered a motion to vacate an *ex parte* restraining order issued pursuant to the RICO statute. The court refused to consider the restraining order as a "taking":

> His contention that he has been deprived of his property without due process is premature. Although the statute contains a provision for forfeiture of property upon conviction, the merits of such a question cannot be examined hypothetically. At the present time, the restraining order serves only to maintain the *status quo* and thus is neither illegal nor unconstitutional. Should the situation change and defendants desire to sell his business . . . or should a *bona fide* offer to buy the business be forthcoming, such facts may be presented to the Court on petition.

A similar situation exists in the present case. It is unlikely that there has been a "taking" such as normally invokes the due process right to a hearing prior to the taking. Nevertheless, so as to prevent possible arbitrary deprivation of property in the short run and "to follow a fair process of decisionmaking," *Fuentes v. Shevin,* 407 U.S. at 80, 92 S.Ct. at 1994, it is considered the better practice to grant a hearing after entry of the *ex parte* order. *Accord, Spilotro,* 680 F.2d at 617.

Necessarily, in view of the "extraordinary circumstances" surrounding the issuance of a restraining order under section 848(d) and the promotion of a "valid governmental interest" in avoiding a pre-order hearing, there is no cognizable due process violation in holding a hearing after issuance of the order. *See Fuentes v. Shevin,* 407 U.S. at 90, 92 S.Ct. at 1999; *Boddie v. Connecticut,* 401 U.S. at 378–79, 91 S.Ct. at 786–787; *Spilotro,* 680 F.2d at 617.

Having determined that some kind of hearing is warranted where there is a deprivation of a "significant property interest" implicating "possessory interests," *Fuentes,* 407 U.S. at 82, 84, 92 S.Ct. at 1995, 1996, and having assumed, *arguendo,* that Defendant's property interests are here implicated so as to require a hearing, it must be decided what kind of hearing need be afforded; what process is Defendant Harvey here due?

It has long been held that "due process tolerates variances in the *form* of a hearing 'appropriate to the nature of the case,' [citation omitted] and 'depending upon the importance of the interests involved and the nature of the subsequent proceedings [if any].' [citation omitted]." *Fuentes,* 407 U.S. at 82, 92 S.Ct. at 1995. (emphasis in original). Due process is thus not a fixed or rigid concept. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

In the present situation, the Court has carefully considered what form of hearing

is appropriate in light of the necessarily preliminary nature of this hearing, the lack of an on-going business entity, the minimal degree of restraint imposed on the Defendant's property, and the broad range of protection and opportunity to be heard that is attendant upon a full-blown criminal jury trial. Bearing in mind that "[t]he fundamental requisite of due process of law is the opportunity to be heard," *Goss v. Lopez,* 419 U.S. 565, 577, 579, 95 S.Ct. 729, 737, 738, 42 L.Ed.2d 725 (1974), citing *Grannis v. Ordean,* 234 U.S. 385, 34 S.Ct. 779, 58 L.Ed. 1363 (1914), the Court undertook a full evidentiary hearing short of a duplicate trial, making only the exception of permitting the admission of hearsay.

The subsequent criminal trial of Defendant Harvey will fully, and in compliance with all the Federal Rules of Evidence, reach every issue bearing on the *actual* forfeiture of his listed assets. The hearing on the restraining order does nothing more than preliminarily establish sufficient reason, under the *Long-Veon* test, to continue the minimal restraint in effect until a final jury decision can be made at trial.

The instant case differs significantly from the prior *Spilotro, Crozier* and *Veon* decisions. In *Spilotro,* no hearing was held before the district judge entered his order on the performance bond, the posting of which would allow defendants' *business* to reopen. Defendant Harvey's business or livelihood is not implicated by the restraint on his assets and the importance of his interests under *Fuentes* is thus significantly lessened.

In *Crozier,* the property of a defendant who was *not* charged with a CCE violation was restrained without any hearing whatsoever under the authority of section 848(d). Clearly, a full hearing was appropriate to determine, if nothing else, what property should not have come under the restraining order. That is certainly not the case here.

Finally, in *Veon,* the government produced *no* admissible evidence to support continuing the restraint. *Veon II,* 549 F.Supp. at 275. That situation differs from the instant action, wherein voluminous testimony and evidence were admitted without hearsay objections.

The nature of the hearing on a section 848(d) restraining order is one that determines whether the *status quo* of a property ought to be maintained pending final resolution at trial. It is, in effect, a probable cause type of hearing. As in a probable cause suppression hearing, the application of the Rules of Evidence is not required by due process. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Allowing hearsay during suppression hearings avoids "exalt[ing] formalities over the fair and expeditious conduct of criminal trials." *United States v. De La Fuente,* 548 F.2d 528, 533 (5th Cir.1977). Other proceedings exempt from the strict rules of evidence are: sentencing, *United States v. Gonzalez,* 661 F.2d 488, 495 (5th Cir.1981); probation hearings, *Zannino v. Arnold,* 531 F.2d 687, 692 (3d Cir.1976); bail hearings, search warrants, *Matlock,* 415 U.S. at 174, 94 S.Ct. at 994; and juvenile bind-over hearings, *United States v. E.K.,* 471 F.Supp. 924, 929 (D.Or.1979).

An additional guide with regard to admission of hearsay testimony may be found by reference to civil forfeiture proceedings. Bearing in mind the preliminary posture of both the criminal and the civil proceedings, in an attempt to find probable cause for initiating a civil forfeiture action or, as here by analogy, continuing the restraining order in a case where criminal forfeiture is possible, the admission of hearsay testimony to establish probable cause was endorsed by the Fifth Circuit in *Bush v. United States,* 389 F.2d 485 (5th Cir.1968) citing *Ted's Motors v. United States,* 217 F.2d 777, 780 (8th Cir.1954):

> We have no doubt that information of guilt, *even though hearsay and incompetent with respect to the merits* of a case such as the instant one, may constitute probable cause or, in other words, a reasonable ground for a belief in guilt, justifying the institution of the action. Any other rule would seem to be illogical, unrealistic and opposed to everyday human experience. (Emphasis added)

In *United States v. Costello,* 350 U.S. 359, 364, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1971), the Supreme Court, in refusing to apply the evidentiary rules to grand jury proceedings, stated:

> In a trial on the merits, defendants are entitled to a strict observance of all the rules designed to bring about a fair verdict. Defendants are not entitled, however, to a rule which would result in interminable delay but add nothing to the assurance of a fair trial.

*See also United States v. Calandra,* 414 U.S. 338, 350, 94 S.Ct. 613, 621, 38 L.Ed.2d 561 (1974).

It is apparent from the volume of evidence amassed by the government that a "mini-trial" following all the rules of evidence would be exorbitantly costly in legal and judicial effort, particularly in relation to the limited interests sought to be protected. This conclusion was made all the more clear at the evidentiary hearing. Other than making a continuing hearsay objection, Defendant's counsel made thirty-three specific hearsay objections. Of the thirty-three objections, twenty-seven were founded purely on record-keeping or similar ministerial bases. All twenty-seven objections could have been cured, but only at the costs of meaningless examination and cross-examination of numerous record-keeping witnesses, the cross-examination of whom would in no way have added to the Court's search for the truth. *Cf.* V Wigmore on Evidence, § 1367, Chadbourn Revision (1974). Government counsel indicated that the proffer of financial analysis *alone* would have lasted no less than three weeks if every record-keeping witness were called. Therefore, having considered all of the foregoing in an attempt to devise a fair and expeditious method of addressing section 848(d) restraining orders consistent with the dictates of due process, it is concluded that admission of hearsay testimony in such a setting is permissible and such testimony may be considered in applying the *Long-Veon* test, 654 F.2d at 915; 538 F.Supp. at 247–48, for issuance of a preconviction restraining order.

### Application of the Long-Veon Standard of Proof

Turning now to the hearing itself, the Court heard testimony and tape-recordings and received evidence founded in the assumption that by a preponderance of the evidence the government must prove to the Court that it is likely to convince a jury, beyond a reasonable doubt, of two things: (1) that the defendant is guilty of violating the Continuing Criminal Enterprise Statute and, (2) that the profits or properties at issue are subject to forfeiture under the provisions of section 848(a)(2). *See Long,* 654 F.2d at 915; *Veon,* 538 F.Supp. 247–48.

Section 848 provides:

[A] person is engaged in a continuing criminal enterprise if—

> (1) he violates any provision of this subchapter or subchapter II of this chapter [Title 21] the punishment for which is a felony, and
>
> (2) such violation is part of a continuing series of violations of this subchapter or subchapter II of this chapter—
>
> > (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
> >
> > (B) from which such person obtains substantial income or resources.

I. In order to establish a violation of the CCE Statute the government must prove that the defendant committed three or more federal narcotics law violations, as defined in subchapter I or II of Title 21. *United States v. Valenzuela,* 596 F.2d 1361 (9th Cir.1979). The government must prove that the defendant was an organizer, manager or person occupying a supervisory position, dealing in such a manner with five or more persons, and that he obtained substantial income or resources.

A close review of all the evidence adduced at the hearing makes clear that the government has met its burden of proof as to the first prong of the *Long-Veon* test. First, thirty bale lists, taken in a controlled

trash pickup from the residence of Defendant Harvey, showed 53 latent fingerprints of the Defendant. The bale lists are contemporaneous notations of smuggling activity showing numbers of imported bales of contraband marijuana and to whom they are entrusted. Further, the government introduced into evidence and played sixteen intercepted and tape-recorded conversations of the Defendant which implicate him in extensive marijuana importation and distribution activities. The conversations are replete with references to persons clearly under the management or supervision of Defendant Harvey and to whom he is heard paying money for their services.* (See, e.g., Reel 2, Meter 690–787, pp. 5–10, conversation of Nov. 21, 1980.)

On Reel 27, Meter 321–550, p. 8, conversation of Nov. 18, 1980, Harvey discusses $235,000 in payments to him for marijuana and how he is owed $198,000. On Reel 26, Meter 215–547, p. 65, conversation of Nov. 18, 1980, Harvey states, with reference to marijuana smuggled, that "I run [sic] over a hundred thousand pounds in over that weekend." (Other testimony at the hearing showed that the wholesale price per pound of marijuana in Southern Florida in late 1980 was between $220 and $250 a pound.)

On Reel 2, Meter 79–1000, p. 18, conversation of Nov. 21, 1980, Harvey states that he has put $100,000 in marked money in his house in some scheme intended to show how police, who apparently would find and confiscate it, would not turn in all the money they confiscated.

On December 9, 1980, Harvey and other co-defendants discussed how much marijuana or money Harvey is owed; the dialogue is as follows: Harvey: "What does he owe me? Answer: He owes you 452475. That's at 2 and a quarter, right." Reel 21, Meter 061–140, p. 4, Dec. 9, 1980. Numerous other conversations discuss marijuana importations and distribution plans. See, e.g., Reel 23, Meter 107–108, pp. 1–3, Dec. 10, 1980; Reel 26, Meter 215–547, p. 51, Nov. 18, 1980;

Reel 24, Meter 050–092, p. 5, Dec. 10, 1980. On December 30, 1980, in a dialogue with co-defendant Robert Gainer Jernigan, Jernigan states that he owes Harvey $477,710. Reel 11, Meter 259–320, p. 2.

It is thus apparent that the government has shown the Court by a preponderance of the evidence that it will likely convince a jury, beyond a reasonable doubt, that Harvey committed three or more federal narcotics violations in concert with five or more persons; that Harvey acted as a supervisor or manager of those persons; and that he obtained substantial income or resources as a result of this conduct.

II. The second prong of the *Long* test requires the government to show that the assets listed in the February 10, 1982 restraining order are subject to forfeiture under 21 U.S.C. § 848(a)(2), which provides:

Any person who is convicted under paragraph (1) of engaging in a continuing criminal enterprise shall forfeit to the United States—

(A) the profits obtained by him in such enterprise, and

(B) any of his interest in, claim against, or property or contractual rights of any kind affording a source of influence over, such enterprise.

In attempting to prove that the profits of Defendant Harvey's continuing criminal enterprise are found in the thirteen listed assets, the government has attempted to show a substantial increase in the Defendant's net worth, an increase that cannot be attributed to legitimate sources of income. The validity of this "net worth" theory of proof has been approved in taxation cases. *See Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954); *Sasser v. United States,* 208 F.2d 535 (5th Cir.1953). Thus, if the government shows a substantial net worth increase and there is no legitimate source for such increase, it is valid to draw an inference that the increase constitutes unreported income, and, in this instance, income from Defendant Harvey's

* Since the evidentiary hearing was held in this matter, the Court, over an 11-week-span, has conducted the trial of ten co-defendants of Defendant Harvey. During this period, scores of self-incriminating conversations of the Defendant were heard in a jury trial setting.

narcotics enterprise. A further inference may attribute the money attendant upon a substantial net worth increase to property purchased contemporaneously. Such property is forfeitable under section 848(a)(2). *United States v. Mannino,* 635 F.2d 110 (2d Cir.1980).

Other cases have not relied on a net worth theory, but have viewed evidence of cash expenditures as showing profit from the enterprise. *See United States v. Bolts,* 558 F.2d 316, 319, 321 (5th Cir.1977) (thousands of dollars changing hands); *United States v. Jeffers,* 532 F.2d 1101, 1104 (7th Cir.1976) (payment of employees); *Long,* 654 F.2d at 912–13, 913 n. 1 (purchase of airplanes, a 65 foot yacht, and three cars); *United States v. Chagra,* 669 F.2d 241, 256 (5th Cir.1982) (purchase of expensive homes).

In the instant case, the government has shown, through its intercepted tape-recorded conversations, that Harvey has received substantial income from his narcotics enterprise. This income undoubtedly made its way to the assets presently restrained. In so proving beyond a reasonable doubt, the net worth analysis undertaken by the government comprised a broad and in-depth financial investigation of Defendant Harvey. Defendant's personal and corporate books and records were examined, numerous interviews were conducted, bank account records were reviewed and Defendant's personal and corporate tax returns dissected. Real property records and records with the Department of Motor Vehicles, Department of Natural Resources, Federal Aviation Administration, and the U.S. Coast Guard were checked and the intercepted conversations again reviewed.

When Harvey was released from prison in 1976, his initial net worth was established as zero. No evidence of cash hoards or other undisclosed substantial assets was adduced, and in the absence of such information, none can be assumed. *See Hayes v. United States,* 407 F.2d 189 (5th Cir.1969). Thus, with reasonable certainty it can be presumed that the Defendant's accumulation of wealth began after he was released from prison.

In 1976, his income was approximately $8500; his 1977 return showed approximately $12,800 in income. The estimated 1978 income, determined from prior and subsequent income, was $20,000 to $22,000. The estimated 1978 income from unknown sources was $389,000. His established 1978 net worth was approximately $204,000.

In 1979, Harvey's known source income was approximately $8,000; his unknown source income was in excess of two million dollars. His 1979 expenditures were calculated at approximately $960,000. His 1979 net worth was over $1.58 million, an increase of $1.38 million from 1978.

The financial analysis indicated that in the 1976 to 1982 period, Harvey had between $100,000 and $120,000 in known source income. During that same period, income from unknown sources, his narcotics enterprise, was calculated at $4.5 million. Each of the thirteen assets listed in the restraining order has been unequivocally associated with Defendant Harvey, either having been purchased by him, used so regularly by him as to indicate ownership, or registered to him, his wife or one of the corporations wholly owned and controlled by him. The purchase dates, where available, for the assets indicate that the assets were acquired during the course of his narcotics enterprise activity. Thus, the evidence is clear that Harvey's substantial income, derived from a continuing criminal enterprise, was channelled, in part, into the purchase of the assets listed in the restraining order.

Further support for this conclusion is derived from the Defendant's own mouth, and it provides compelling reason to continue the restraining order in effect. On January 6, 1981, Harvey, aware that he was the target of an F.B.I. investigation, and obviously aware of the forfeiture provisions of the federal narcotics laws, discussed in detail his arrangements for disposing of his property and moving from South Florida. His relevant statements are as follows: "The boat should be gone by the weekend. I'm sellin [sic] the boat.... You know

how worried I am. My both Mercedes are goin [sic] by Friday. My Bronco I'm gonna sell to your son, I'm buyin [sic] a station wagon and I'm movin [sic] probably by [sic] in two weeks. That's how worried I am right now.... They [F.B.I.] get wind I'm sellin [sic] this [property], they're gonna come take it on me.... They [F.B.I.] want anything they can get from me just to blow it up in the newspaper. When it comes time they ain't gonna be able to get nothin [sic] from me.... The move is to sell everything and not to nobody I know.... They're takin [sic] everything, in my wife's name, in my, her maiden name, they're gettin [sic] everything.... I won't buy nothin [sic] right now. I got a lot of [property] I gotta get rid of. I've been on the phone all night sellin [sic] race cars." Reel 19, Meter 56–95, pp. 1–5, conversation of Jan. 6, 1981.

It is well-settled law that the flight of an accused, as Harvey was preparing to do, is competent evidence against him as having a tendency to establish guilt. *Allen v. United States,* 164 U.S. 492, 499, 17 S.Ct. 154, 156, 41 L.Ed. 528 (1896); *United States v. Ballard,* 423 F.2d 127 (5th Cir.1970). When all the evidence adduced at the hearing is weighed pursuant to the *Long-Veon* standard for continuing a section 848 restraining order, it is apparent that the government has more than met its burden. Defendant Harvey's substantial income from his narcotics enterprise has been convincingly demonstrated, the application of the income to the restrained assets has been shown, ownership (or, at the very least, control) of the restrained assets has been attributed to Harvey, and his efforts to frustrate federal forfeiture provisions have been revealed in no uncertain terms.

Obviously, the application of any or all of the principles of law previously stated is appropriate, and, indeed must be implemented, on a case-by-case basis. The Court has so applied the law to the facts of this case. It should be further noted that on the basis of factual circumstances, the Court has carefully distinguished the *Crozier, Spilotro,* and *Veon* cases from the one *sub judice,* and has, accordingly, come to its conclusions.

In view of all the foregoing, it is

ORDERED AND ADJUDGED that Defendant's Motion to Vacate Restraining Order be, and the same is, hereby DENIED. The Restraining Order of February 10, 1982, is hereby incorporated into this Order and it shall remain in full force and effect until further Order of this Court.